Coley (NMN) GATES, Respondent,

v.

STATE of Minnesota,
Petitioner, Appellant.

No. C6–85–2273.

Supreme Court of Minnesota.

Jan. 9, 1987.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas L. Johnson, Hennepin Co. Atty., Vernon E. Bergstrom, Chief, Appellate Section, Michael Richardson, Minneapolis, for appellant.

Charles L. Hawkins, St. Paul, for respondent.

## OPINION

AMDAHL, Chief Justice.

We granted the state's petition for review of the decision of the Court of Appeals holding that the trial court erred in denying defendant's 1985 petition for relief, in the form of a new trial, from two 1983 convictions of assault with a dangerous weapon, Minn.Stat. § 609.222 (1984). The Court of Appeals ruled that defendant's trial counsel failed to represent him effectively, that defendant was prejudiced as a result, and that therefore a new trial was required. *Gates v. State*, 393 N.W.2d 417 (Minn.Ct.App.1986). We reverse the decision of the Court of Appeals and reinstate the judgment of conviction.

At 1:05 a.m. on Sunday, April 17, 1983, a shooting incident occurred at The Taste Bar on North Fifth Street, ½ block off Hennepin Avenue in downtown Minneapolis. A police officer who was present outside to divert traffic when the Saturday night crowd left the bar heard the shots and saw gunsmoke coming out of the open side door, then saw the door close as the shots were being fired. After the shots stopped he saw a man come out the door by himself and start walking north on Fifth as if ready to run. When the man ignored the officer's order to halt, the officer grabbed him and forced him to the ground onto his back and frisked him quickly and superficially, finding nothing. On seeing two more men exit through the door, the officer left the first man and temporarily seized these two men. While holding them he looked into the bar and saw an employee of the bar moaning. This employee apparently thought that the gunman was still in the bar and he said that the two men that the officer was holding were not involved. The officer then entered the bar. A search of the bar, which was crowded with 300 to 400 people, failed to result in the discovery of a suspect or the weapon.

Police investigation revealed that two bouncers had escorted defendant, who was known in the bar as "Black Jack," out of the bar at 12:45 a.m., and that defendant after remaining outside for awhile, reentered the bar and started shooting at one of the bouncers, Craig Peterson, at 1:05 a.m. Three shots hit Peterson, one in the arm, one in the thigh and one in the abdomen, causing an abdominal obstruction that re-

quired doctors to perform a colostomy. Another bouncer, Sylvester Washington, was grazed by a bullet. A customer, Diane Pike, was shot in the leg and still has a limp as a result.

Washington and Pike apparently told police that they did not see the gunman. William Gaines, assistant manager, saw defendant in the area where the shots were being fired and saw something in his hand that could have been a gun. Police obtained defendant's police photo, selected photographs of seven other men who were similar to defendant in appearance, and showed the eight pictures to the people who saw the gunman as well as to the officer who stopped the first man out the side door after the shooting. The officer identified defendant's picture as the man he briefly detained and superficially frisked. Craig Peterson, the bouncer, identified defendant's picture as a picture of the man that he had escorted out earlier and as the man who shot him. (Peterson had worked as a bouncer for only 5 weeks, a period when defendant was banned from the bar, and therefore he had not seen defendant before.) Pike's friend, Lisa Phillips, also picked defendant's picture, saying he was the man she saw fire the gun. Renee Cyr, another friend of Pike, also identified defendant as the gunman, saying that she knew him as "Black Jack" from having seen him in the bar on other occasions. Another bouncer, Dale Carnell, did not see the shooting but identified defendant as the man that Peterson and Washington escorted out at 12:45 a.m.

Defendant was arrested the following day and charged with three counts of assault with a dangerous weapon. He retained private counsel, Wayne Salita, who had known him for a number of years and had represented him on other occasions. Defendant's brother paid Salita $2,000 to represent him. According to Salita, he told defendant he would need more money to investigate the case but defendant replied that he was not interested in paying to investigate the case. Salita told defendant to at least bring in those people that defendant knew who were at the bar. Defendant apparently brought a number of people to Salita's office and Salita talked with these people. Salita, who had a copy of the state's file, including all the police reports, also called and talked with the officer who identified defendant as the man who left the side door of the bar moments after the shooting. Salita relayed to defendant a plea offer whereby defendant would plead guilty to one count, but defendant refused the offer. Salita did not move to suppress identification evidence or the statement defendant made to the police because he saw no merit to either motion. On Salita's recommendation, defendant waived a jury trial (Salita reasoned that defendant, who was, in Salita's words, a "street person" and looked it, would not make a good impression on a jury).

Of the witnesses that we have identified by name, all but Washington, who said he did not see the gunman, testified. Defendant testified that the shooting occurred as the bouncers were ejecting him and assaulting him. He denied that he was ejected earlier and then returned. He testified that his "associate," Mickey Johnson, intervened and began shooting. He testified that Johnson then "left town." Defendant gave this version of the incident to defense counsel only 2 days before trial. Anticipating cross-examination by the state as to why defendant did not give the information to the police when he made his statement to the police shortly after the police arrested him, defense counsel elicited evidence that defendant had held this information back even from defense counsel until 2 days before trial because he did not want to reveal the information. (He later allowed defendant to elaborate on this on redirect examination by eliciting evidence that defendant both feared Johnson and was trying to protect him.) Defendant's version of the offense was supported by Walter Kennedy, also an "associate" of defendant, who testified that Mickey Johnson did the shooting. Defense counsel did not call one Maurice Peals, whom defendant brought with him for trial, apparently because he believed that Peals' ver-

sion was consistent with the state's version that defendant was thrown out and then returned.

The trial court dismissed the charge involving Washington, who did not testify, but found defendant guilty of the other two charges. He sentenced defendant to concurrent terms of 30 and 60 months.

Two years later, in 1985, Charles Hawkins of the Thomson and Hawkins firm filed the postconviction petition on defendant's behalf. Hawkins called two criminal defense attorneys as expert witnesses, Joe Friedberg and John Wylde, Jr., both former partners of Thomson. Both testified that it was negligence for Salita (a) to fail to hire an investigator or do the investigation himself; (b) to fail to move for a pretrial suppression hearing on the fairness of the identification procedures and on the admission of the defendant's exculpatory statement to the police; (c) to fail to request a continuance to try to locate Johnson; (d) to recommend that defendant waive a jury trial; and (e) to elicit the evidence that defendant did not even tell defense counsel about Johnson until 2 days before trial. Friedberg basically said that the result *would* have been different if Salita had not waived a jury trial and if he had handled the case as Friedberg would have. Wylde said that it *could* have been different. Both admitted that they did not read the state's file and that they based their opinions on reading most of the trial transcript and on talking with Charles Hawkins. Hawkins did not produce any evidence that would have been discovered if Salita had investigated the case more thoroughly or make any attempt to show that he would have prevailed at a supression hearing if he had requested one. He did call Peals, who testified that he would have testified that Johnson fired the shots. Salita denied that this is what Peals told him.

The trial court concluded that the representation of defendant by Salita was "below the professional standards of the legal profession in [the] community" but that defendant "did not establish a reasonable probability that, but for [Attorney] Salita's unprofessional errors, the result of the trial would probably be different."

In reversing, the Court of Appeals stated that Salita acted ineffectively and negligently in failing to investigate; in failing to move to suppress the identification evidence, in eliciting the evidence; that defendant did not tell his attorney until 2 days before trial about Johnson; and in not calling Peals. *Gates,* 393 N.W.2d at 419–20. The Court of Appeals did not explain in what way defendant had established prejudice but said that it did not think that the trial court's conclusion that no prejudice resulted was "the product of an objective review of the record." *Id.* at 420. Judge Huspeni, concurring, said that she would cite as the sole basis for reversal defense counsel's failure to investigate. *Id.* at 420. Her position was that defendant failed to show prejudice as to the failure to move to suppress, the elicitation of the evidence, and the failure to call Peals, but that it was not necessary for defendant to show actual prejudice from the failure to investigate because "it is impossible to determine what evidence an investigation may have after unearthed ..." *Id.*

■ The two leading cases are *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and the subsequent case of *Hill v. Lockhart,* — U.S. ——, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). These cases set forth a two-part test that postconviction courts and appellate courts must apply in determining whether to grant a defendant a new trial on the ground of ineffective assistance of counsel. The defendant must affirmatively prove that his counsel's representation "fell below an objective standard of reasonableness" and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 688, 694, 104 S.Ct. 2052, 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068.

■ In this case it is unnecessary to decide whether defendant met his burden

of proving that Salita was negligent in his representation of defendant because our review of the record convinces us that defendant did not prove that, but for any of Salita's alleged mistakes, the result of the trial would have been different.[1] *Strickland* makes it clear that there is no presumption of prejudice in an ordinary case involving a claim of ineffective assistance of counsel where there is no claim of a conflict of interest by defense counsel; rather, the defendant must show that counsel's errors "actually" had an adverse effect in that but for the errors the result of the proceeding probably would have been different. 466 U.S. at 693–94, 104 S.Ct. at 2067–68. In determining whether the defendant has made the requisite showing, the court must consider the totality of the evidence before the judge or jury. *Id.* at 695–96, 104 S.Ct. at 2068–69. In *Hill v. Lockhart,* the Court spoke to the issue of prejudice in the context of a claim of failure to investigate or discover potentially exculpatory evidence, and stated that a court must assess the evidence that a proper investigation would have discovered and determine whether that evidence likely would have changed the outcome of the trial. 106 S.Ct. at 370–71.

■ We agree with Judge Huspeni's concurrence that defendant failed to show that he was prejudiced by (a) the failure to move to suppress, (b) the elicitation of the evidence that defendant did not tell Salita until 2 days before trial about Johnson, and (c) the decision not to call Peals. (a) The photographic display itself was clearly fair and defendant offered no evidence at the postconviction hearing that there was any suggestiveness on the part of the police in

showing the photographs to witnesses. (b) The decision to elicit the evidence that defendant did not tell Salita earlier about Johnson could not have prejudiced defendant because the prosecutor presumably would have impeached defendant on cross-examination by eliciting evidence that in his statement to the police defendant made no mention of Johnson or of who did the shooting. (c) Defendant failed to establish that Peals' testimony would have helped him; indeed, if Salita's recollection of what Peals told him at the time of trial is correct, Peals' testimony would have hurt defendant.

■ It was the view of Judge Huspeni and apparently of the other members of the panel that it was not necessary for defendant to show actual prejudice from the failure to investigate because, as Judge Huspeni put it in her concurrence, "it is impossible to determine what evidence an investigation may have after unearthed ..." *Gates,* 393 N.W.2d at 420. We disagree with the conclusion that it was not necessary for defendant to show actual prejudice.

■ In a case such as this a reasonable defense counsel (a) might have interviewed the witnesses named in the police reports, (b) might have interviewed the witnesses named by the defendant, and (c) might have conducted an independent investigation to locate other witnesses. (a) Salita interviewed only the police officer who saw defendant coming out of the bar, but he did not try to interview the others named in the police reports. Defendant made no showing at the postconviction hearing that Salita's failure to interview the others prej-

1. As stated in *Strickland:*

> [T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order [as we have done] or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's per-

formance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.

466 U.S. at 697, 104 S.Ct. at 2069. For a detailed discussion of the negligence component of a defendant's burden of proof, *see Strickland,* 466 U.S. at 687–91, 104 S.Ct. at 2064–66.

udiced him. (b) Salita apparently did interview the witnesses that defendant produced; these interviews apparently were conducted in Salita's office. (c) Finding witnesses from any of the 300 to 400 people in the bar might well have been as difficult for Salita then as it would have been for defendant's present attorney, Hawkins, to do before the postconviction hearing. Assuming for purposes of this decision that Salita should have tried, it is not proper under *Strickland* to base a reversal on speculation that an investigation might have found someone who would have helped defendant's case. Rather, defendant had an affirmative burden to actually show that someone would have been found by Salita and that that witness' testimony probably would have made a difference; defendant did not even attempt to meet that burden. As for Johnson, a motion for a continuance to try to locate him likely would have been denied by the trial court and, in any event, defendant made no showing at the postconviction hearing that there is a Mickey Johnson, that he could have been located, that he would have testified, and that his testimony would have helped defendant.

Further, an analysis of prejudice must be made in the context of the totality of the evidence before the factfinder. The trial court did that and we have done that also. The evidence of defendant's guilt was very strong, consisting of positive eyewitness identification of him as the gunman and of strong corroborating evidence. Defendant made no showing whatever at the postconviction hearing that the trial would have been different in any way if his attorney had represented him differently.

Reversed and judgment of conviction reinstated.