**STATE of Minnesota, Appellant,**

. v.

**Kye Lamar POWELL, Respondent.**

**Nos. C0–96–1700, C8–96–1699.**

Supreme Court of Minnesota.

May 14, 1998.

Michael O. Freeman, Hennepin County Attorney, Jean E. Burdorf, Assistant County Attorney, for Appellant.

John M. Stuart, Minnesota State Public Defender, Ann McCaughan, Assistant State Public Defender, for Respondent.

## OPINION

STRINGER, Justice.

The court of appeals reversed the district court's order denying postconviction relief and the state appeals. Because the postconviction court did not abuse its discretion in denying respondent's petition, we reverse.

On May 7, 1994, around 11:30 p.m., respondent Kye Powell and three friends, D.F., A.H., and A.M., all minors, left a barbecue at A.H.'s house in Minneapolis. Near the intersection of 13th Avenue and 21st Street, the youths passed three intoxicated Native American men standing by a small concrete retaining wall next to a sidewalk. As they passed, the youths thought that one of the men said "nigger," and the youths decided to "talk back" to the men. Respondent hit the smallest man, 64–year–old James Cloud Morgan, and a fight erupted involving everyone. While D.F. and A.M. fought the other two men, A.H. hit Cloud Morgan in the face and respondent kicked him multiple times in the stomach. Cloud Morgan, a slight man 5 feet 6 inches tall and weighing less than 150 pounds, did not fight back.

The police responded to a call, found Cloud Morgan lying semiconscious and bleeding on the sidewalk and administered first aid. When the paramedics arrived, Cloud Morgan was transported to Hennepin County Medical Center where he was pronounced dead within hours. The cause of death was determined to be blunt force injury to his abdomen resulting in the rupture of his liver and extensive loss of blood from the liver injury.

The police were able to identify the suspects with the help of three children, ages 11 to 13, who witnessed the attack from a porch across the street. All three child witnesses later identified respondent as Cloud Morgan's assailant in a photographic lineup as well as in court.

A couple of days after the incident, respondent heard that the police had in custody two of his friends involved in the attack, and he went to his uncle, Jerry Powell, for assistance. Jerry Powell called a neighborhood organization and was referred to attorney A. Demetrius Clemons, who agreed to provide legal representation to respondent. Respondent and Clemons met at the police station where respondent turned himself in. Four days after the killing, on May 11, 1994, Hennepin County filed a petition in juvenile court charging respondent and his three accomplices with second-degree murder, Minn.Stat. § 609.19, subd. 2 (1996). The state filed motions for adult certification of all four juveniles, but before respondent's hearing D.F., A.H. and A.M. pled guilty as juveniles to

second-degree felony riot. Respondent turned 16 years old in June 1994 before the certification hearing or trial.

The juvenile court judge ordered a psychological evaluation of respondent as part of the adult certification proceeding. After interviewing respondent in June 1994, the psychiatrist issued a report concluding that "[respondent] was able to accurately describe the basis upon which the certification study was ordered, and the potential implications for him were he to be referenced to stand trial as an adult." The intellectual assessment revealed that respondent had a full scale IQ score of 75, which placed him in the borderline range of intellectual functioning. Respondent's IQ was in the bottom 5%, meaning that 95% of other adolescents his age score above him. His achievement test scores indicated 6th grade reading, mathematic, and spelling abilities, three grades below his current grade level. The juvenile court judge certified respondent to adult court on August 24, 1994, finding that he was not amenable to treatment in the juvenile system and that public safety would not be served by retaining him in the juvenile system. Respondent did not appeal the adult certification order and later claimed that Clemons had advised him that he would "be better off in adult court." Clemons claimed that the decision not to appeal resulted from a discussion with respondent and his grandmother in which he informed them that an appeal would take several months and most likely would not succeed. The state filed second-degree felony murder charges against respondent in Hennepin County District Court on August 26, 1994.

Around the time of a November 7, 1994 pre-trial conference, the state conveyed to Clemons an offer for respondent to plead guilty to first-degree manslaughter with a sentence of 78 months. The offer was rejected. During the jury voir dire on November 14 or 15 but prior to the start of trial, the state conveyed a second plea offer of a 64–month sentence for a plea to first-degree manslaughter. That offer was also rejected.

Respondent's jury trial in adult court began on November 16, 1994. At trial, two of respondent's accomplices and the three child witnesses all testified that respondent repeatedly kicked and punched Cloud Morgan

on May 7, 1994. Respondent testified in his defense, claiming that he just stood in the street laughing and that he was the first to run away. Respondent admitted that he kicked one of the men but denied that he kicked or struck Cloud Morgan, claiming that D.F. kicked and stomped on Cloud Morgan. On November 22, 1994, the jury returned a verdict of guilty and the court sentenced respondent to the presumptive sentence of 150 months on December 14, 1994.

Respondent contacted the Office of the State Public Defender on March 14, 1995, asking for help with his appeal. Respondent wrote that Clemons had told him his case would be appealed automatically because of his age, but respondent had not heard anything yet and was concerned. Coincidentally, the time to appeal the conviction expired on this same day. An assistant state public defender took the case, a motion for a late filing of respondent's appeal was granted by the court of appeals, and the appeal proceeded. The court of appeals later granted respondent's motion for a stay of the appeal and a remand to the trial court for postconviction proceedings on the issue of ineffective assistance of counsel.

Postconviction proceedings were bifurcated with the ineffective assistance of counsel claim for the adult certification assigned to the juvenile court judge and the ineffective assistance of counsel claim during trial assigned to the trial court judge. Neither court heard oral testimony but accepted affidavits from respondent, trial defense counsel Clemons, appellate defense counsel, the assistant county attorneys from respondent's trial, and four of respondent's family members—his mother Dorothy Powell, his grandmother Joanne Powell, and his uncles Jerry Powell and Frank Powell.

Respondent argued that Clemons' assistance was ineffective in three areas: first, Clemons was inattentive and failed to fully investigate and prepare respondent's case; second, Clemons failed to fully advise him of his rights; and third, Clemons failed to communicate the plea offers to respondent.

As to the first claim, respondent asserted that Clemons did not talk with him sufficiently before trial, seemed distracted, and should

have more fully investigated his case. Clemons maintained that he did not neglect respondent's case and was aggressive, thorough, and competent in his representation. The postconviction court made factual findings that Clemons hired an investigator prior to trial, challenged the admissibility of evidence at a *Rasmussen* hearing, prevailed in his motion to admit A.H.'s statement in evidence over the state's objection, vigorously cross-examined witnesses at trial, and fully argued respondent's defense to the jury. The court concluded that Clemons appeared prepared, competent and diligent.

The second issue, that Clemons failed to fully advise respondent of his rights, encompasses respondent's claims that Clemons did not inform him that he could appeal the adult certification and that Clemons failed to pursue the direct appeal of his convictions. Respondent stated that he "didn't understand what was happening during all the hearings that [he attended and that he] didn't understand [his] rights." Clemons asserted that he "actively communicated to [respondent] every item of importance," including informing respondent about the proceedings, his legal rights and his right to appeal. Clemons explained that respondent chose not to appeal the adult certification because Clemons advised him that he would probably remain in custody pending the appeal, the process could take several months, and most certifications are affirmed. The postconviction court found that Clemons met with respondent, communicated all necessary information to respondent, and respondent did understand the process and no issue had been raised regarding respondent's "alleged 'impaired intellectual capacities,' * * * diminished capacity or lack of understanding." Additionally, the court found that respondent was not prejudiced by Clemons' failure to appeal because respondent was able to file a late appeal with representation from the public defender's office.

The third issue, Clemons' alleged failure to communicate the plea offers to respondent, is the core of respondent's ineffective assistance claim. Respondent asserted in his affidavit that Clemons "never explained any terms of any plea offer made by the state * * * and [respondent] never turned down any plea offers before or during [his] trial."

The public defender stated that she did not learn about any plea offers until respondent's uncle, Jerry Powell, mentioned that he heard about one plea offer from a "woman from the prosecutor's office who had expressed surprise that [respondent] had turned down a plea offer." Later the public defender discovered that two plea offers had been made and rejected. Upon hearing about the two offers, respondent's family expressed shock. All four family members maintain that they never heard about any plea offers before or during trial.

The two assistant Hennepin County attorneys who prosecuted respondent assert in their affidavits that they conveyed a plea offer of 78 months to Clemons on or about November 7, 1994, and the offer was rejected. They also state that during a recess in the jury selection process on November 14 or 15, they conveyed a plea offer of 64 months to Clemons at the counsel table in respondent's presence. Both prosecutors state in their affidavits that they heard Clemons communicate the offer to respondent, who rejected it.

Clemons does not dispute the timing or content of the plea offers in his affidavit and he contends that he communicated the plea offers to respondent. Clemons asserts that respondent was "adamant in his assertion that he did not jump on the victim[,] that it was somebody else" and therefore he would not plead guilty. Clemons claims that "[i]t was [respondent's] position that the children who witnessed this incident were going to come in and say that he wasn't the one, I assured him that I didn't see any reason that they would come in and say anything different than what they had said in their statement [h]e felt confident that they had mistaken him and they would testify differently at trial."

The postconviction court found that Clemons communicated the 78–month plea offer to respondent and the offer was not accepted, that Clemons communicated the 64–month plea offer in the presence and hearing of the county attorneys and the offer was not accepted, and that all three attorneys—Clemons and the two prosecutors—were consistent in their sworn statements regarding the

timing, content, and communication of the plea offers. In its findings of fact, the postconviction court found that respondent, in the belief that the witnesses would change their testimony at trial, would not have accepted a guilty plea and that respondent's assertion that he could have agreed to and the court would have accepted an *Alford* plea[1] was "pure speculation."

The postconviction court concluded that respondent failed to establish ineffective assistance of counsel under the United States Supreme Court test in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and our decision in *Gates v. State,* 398 N.W.2d 558 (Minn.1987), because he failed to prove that Clemons' representation fell below an "objective standard of reasonableness" and failed to show that but for Clemons' deficient performance the result of the proceeding would have been different.

Respondent filed an appeal with the court of appeals challenging the juvenile and district court denials of postconviction relief. The court of appeals consolidated the appeals, affirming the denial of postconviction relief as to the adult certification in juvenile court but reversing the denial of postconviction relief in district court. *Powell v. State,* 562 N.W.2d 14 (Minn.App.1997). The court of appeals remanded for a new trial in adult court. *Id.*

Although the court of appeals listed Clemons' failure to investigate respondent's case fully and keep in contact with respondent as examples of Clemons' ineffective assistance, notably it did not conclude that the postconviction court abused its discretion by finding otherwise. Focusing on Clemons' communication of the plea offers, the court of appeals accepted the postconviction court's findings of fact that the plea offers were communicated, but held that Clemons' assistance was ineffective because the communication was not adequate given respondent's age, intelligence, and severity of the offense:

> A 15 year old [sic] being tried in adult court, having been charged with commission of a violent crime resulting in death, can hardly be said to have made an informed decision concerning a possible plea of guilty and a sentence of 64 months incarceration when the offer is relayed in a fleeting communication for a few seconds at counsel table.[2]

*Id.* at 18. The court of appeals rejected the district court's finding that respondent failed to show that he would have accepted any plea agreement and substituted its own finding that respondent was prejudiced by the ineffective assistance because he was "effectually deprived the right to opt for a shorter term of incarceration"—and that therefore Clemons' representation of respondent fell below an objective standard of reasonableness and that respondent was prejudiced by the ineffective assistance. *Id.*

■ Our review is limited to determining whether there is sufficient evidence to sustain the postconviction court's findings. A postconviction court's decision will not be disturbed absent an abuse of discretion. *Hodgson v. State,* 540 N.W.2d 515, 517 (Minn.1995).

■ The Sixth Amendment guarantees a defendant charged with a crime the right to a fair trial, and the right to effective assistance of counsel is an integral component of that right. *Strickland,* 466 U.S. at 686, 104 S.Ct. at 2063–64. In *Strickland,* the Supreme Court noted that the purpose of the right to counsel is to ensure a fair trial, tested by considering whether "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. at 2064. Because of the variety of ways to effectively

---

1. An *Alford* plea allows a trial court to accept a guilty plea even though the defendant maintains his innocence if the court examines the factual basis of the plea and concludes through a colloquy with the defendant that "there is evidence which would support a jury verdict of guilty and that the plea is voluntarily, knowingly, and understandingly entered." *State v. Goulette,* 258 N.W.2d 758, 760 (Minn.1977); *see North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

2. Of concern is that nowhere in the record is there any reference to how long or in what manner the plea offer was communicated—the court of appeals' reference to "a fleeting communication for a few seconds" is wholly unwarranted.

represent a client, the Supreme Court emphasized the need for wide deference and a presumption of effectiveness for legal representation that could be considered trial strategy. *Id.* at 689, 104 S.Ct. at 2065. The Court set forth two levels of proof for establishing assistance so ineffective as to require reversal: first, the defendant must show that counsel's performance was so deficient that judged against "an objective standard of reasonableness" counsel was not functioning as "counsel" guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the result. *Id.* at 687–89, 104 S.Ct. at 2064–65. The respondent, not the defense counsel, carries the burden of proof of ineffective assistance of counsel.[3] Here, the judge of the postconviction district court was the same judge who presided over respondent's trial and therefore had the opportunity to observe both respondent and defense counsel with respect to the specific areas in which respondent claims Clemons' counsel was ineffective. Regarding respondent's first claim that Clemons was inattentive and failed to prepare and investigate fully, the postconviction court found that Clemons was prepared and competent, and we conclude there was substantial evidence to support this finding: Clemons hired an investigator, challenged the admissibility of evidence, made motions to admit testimony, cross-examined witnesses, and argued respondent's defense to the jury.

■ Similarly, contrary to respondent's second claim that Clemons failed to fully advise respondent of his rights, we conclude that substantial evidence supported the postconviction court's finding that respondent did understand the process and Clemons communicated all necessary information to him. The trial court observed respondent throughout his trial and found no basis to question his competence.

■ As to respondent's third claim, that Clemons did not communicate the plea offers, the record is notably scant with respect to conversations that might have or did take place between respondent and Clemons. Respondent claims that he never knew about the first plea offer; Clemons claims that he communicated the offer to respondent, but it was rejected because of respondent's belief that the witnesses would change their testimony. The same conflict in testimony applies to the second plea offer, but Clemons' communication of the second plea offer is corroborated in the affidavits of the two prosecutors.[4] We attach no particular significance to the lack of witnesses to these communications however, because negotiations on such matters usually take place in private and attorney-client privilege would normally constrain the court's access to such conversations. In any event, the postconviction court found that the offers were communicated and we conclude that the court did not abuse its discretion in relying on the affidavits of the attorneys involved to establish that the offers were in fact communicated.

The dissent's conclusion that counsel's assistance would be ineffective if no further discussion of the second plea offer occurred beyond the communication noted in the affidavits ignores the context of the trial. Because of respondent's insistence of his innocence, belief that the witnesses would change their testimony at trial, and rejection of the first plea offer, counsel could have reasonable concluded that additional discussion would have served no purpose.

■ Finally, we note that respondent has failed to meet his burden of proof under the second level of the *Strickland* analysis—that he was prejudiced by deficient representation. The postconviction court concluded that no prejudice arose because respondent was not amenable to accepting a guilty plea

3. The court of appeals erred by improperly shifting the burden to the defense counsel: *"Clemons* failed to show that he took appropriate steps to inform Powell of the legal procedures and effects of the plea offers." *Powell,* 562 N.W.2d at 19. (Emphasis added.)

4. The affidavits provide only vague accounts of the second plea communication. The first prosecutor's affidavit stated "[d]uring a recess of the

jury selection process, a second offer was tendered to Mr. Clemons, at counsel table. The offer which was for a prison-commit for a term of approximately 64 months, was communicated to [respondent] by Mr. Clemons in the presence of myself and [the other prosecutor]; this offer was rejected by [respondent]." The second prosecutor's affidavit stated "I heard Mr. Clemons specifically relate this offer to [respondent] at counsel table. This offer was also not accepted."

in any event, no evidence indicated that respondent would have pled guilty, and other evidence demonstrated his belief that the witnesses would change their testimony. Furthermore, as to the *Alford* plea, no evidence established that the court would have accepted such a plea. We conclude that the court did not abuse its discretion in denying relief on these grounds as well.

The postconviction court did not abuse its discretion in denying respondent's petition for relief based on ineffective assistance of counsel. Respondent failed to prove that Clemons' performance as counsel was so deficient as to require reversal and that Clemons' performance prejudiced respondent by altering the result.

Reversed.

GILBERT, J., took no part in the consideration or decision of this case.

BLATZ, Chief Justice (dissenting).

I respectfully dissent. I would reverse the denial of postconviction relief and remand to the district court for further proceedings on the narrow issue of Clemons' communication of the second plea offer to respondent. The postconviction court found that the second plea offer was conveyed to Clemons at counsel table and in the presence of respondent during a recess in the jury selection process. Affidavits from the two prosecuting attorneys state that they heard Clemons communicate the offer to the respondent and that the offer was rejected. If this was the extent of the communication, I would hold that respondent did not receive effective assistance of counsel.

The duty to advise a client of a plea offer goes beyond mere communication that an offer exists. To secure the effective representation guaranteed to criminal defendants under the Sixth Amendment, an attorney is obliged to explain to the defendant the possible ramifications of accepting or declining a plea offer in such a manner so as to ensure the defendant has a clear understanding to make an informed decision. Particularly troubling here is respondent's age, intelligence level, and the severity of the offense. A 16-year-old with limited comprehension skills, being tried as an adult for second-degree felony murder, can hardly be expected to make an informed decision concerning a plea offer if, as the record currently reflects, the offer is briefly communicated in an open courtroom, in the presence of opposing counsel.

In order to grant a defendant postconviction relief on the ground of ineffective assistance of counsel, the defendant must affirmatively prove that his counsel's representation "fell below an objective standard of reasonableness" and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Gates v. State,* 398 N.W.2d 558, 561 (Minn.1987) (citing *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 2064-65, 80 L.Ed.2d 674 (1984)). The majority's analysis focuses in on the singular act of communication of the plea offer. I do not disagree with its conclusion, or the finding of the postconviction court that a 64 month plea offer was, in fact, communicated to the respondent. Of concern, however, is that the record presented on appeal indicates that nothing more than a "communication" of an offer occurred. While the majority takes issue with the court of appeals statement that the communication took place in a matter of seconds, the record does not support a conclusion that anything more than a verbal statement of a 64-month-offer was given to the respondent. If the only plea offer discussion that occurred between Clemons and respondent was at the counsel table in the presence of the prosecuting attorneys, I would conclude that Clemons' assistance fell below the standard of objective reasonableness. A reasonably prudent attorney would have taken additional measures to ensure that a 16-year-old client with borderline intellectual functioning truly understood the legal implications of declining the plea offer. At the very least, a reasonably prudent attorney would have discussed the plea offer with the defendant in private. Moreover, if in fact the record accurately reflects the extent of Clemons' representation on this issue, I would conclude that respondent was prejudiced by the ineffective assistance of counsel he received because respondent was therefore deprived of the right to elect a shorter term of incarceration.

Accordingly, I would remand to the post-conviction court for evidentiary hearings to determine whether Clemons discussed the plea offer with respondent outside the hearing of the prosecuting attorneys and others. I do not believe that such an inquiry would depart from this court's longstanding recognition of the flexibility and discretion inherent in attorney client representation. *See King v. State,* 562 N.W.2d 791, 795 (Minn. 1997). What is disturbing about this case is not what we do not know—but what we do. The trial court needs to make the necessary findings that defense counsel did more than simply tell the respondent that the state was offering him 64 months upon a plea of guilty. If no further discussion took place between Clemons and respondent other than that which is documented, respondent should be granted postconviction relief by receiving the benefit of the second plea offer.