*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0451
A15-0479
A15-1399**

In the Matter of the Welfare of the Children of:
C.L.T. and J.T., Parents.

**Filed February 22, 2016
Affirmed
Chutich, Judge**

Chisago County District Court
File Nos. 13-JV-14-314;
13-JV-13-281

Dorothy M. Gause, Dorothy M. Gause, LLC, Stillwater, Minnesota (for appellant mother)

Gregory J. Schmidt, Bayport, Minnesota (for appellant father)

Jodi L. Proulx, Hugo, Minnesota (for appellant children)

Maureen Caturia, Assistant Chisago County Attorney, Center City, Minnesota (for Chisago County Health and Human Services)

Charlene Larsen, Cambridge, Minnesota (Guardian ad Litem)

Considered and decided by Cleary, Chief Judge; Reilly, Judge; and Chutich, Judge.

**U N P U B L I S H E D   O P I N I O N**

**CHUTICH**, Judge

In these consolidated appeals, appellants mother and father, C.L.T. and J.T. respectively, and two of their children, V.T. and D.T., challenge the termination of parental

rights to all four of the family's children. In addition, C.L.T. challenges the district court's denial of her post-trial motion seeking a new trial because of alleged ineffective assistance of trial counsel. Because the district court did not err in denying C.L.T.'s motion for a new trial, because the district court's finding that a statutory ground for termination exists is supported by clear and convincing evidence, and because the district court did not abuse its broad discretion in finding termination to be in the children's best interests, we affirm.

## FACTS

This case arises from a petition to terminate C.L.T's and J.T.'s parental rights. C.L.T. and J.T. have four children: V., 14 years old; D., 11 years old; A., 8 years old; and R., 5 years old.[1] At the time of trial, C.L.T. and J.T. were married.

The parents each have a lengthy history of incarceration, chemical-dependency treatment, relapse, and involvement with county child-protection services. When living in the community, C.L.T. and J.T. do not share a home but share caretaking responsibilities for the children. The parties agree that C.L.T. has been the parent primarily responsible for the children's care. The relevant family history follows.

### J.T.

J.T. is addicted to prescription pills and methamphetamine. He began abusing drugs as a teenager and has attempted chemical-dependency treatment at least 16 times. J.T.'s drug use and reports of his domestic violence first drew the attention of Hennepin County child-protection services to the family in September 2004. When Chisago County first

---

[1] By virtue of their ages, V. and D. are parties to this appeal. *See* Minn. Stat. § 260C.163, subd. 3(b) (2014).

opened a child-protection assessment for the family in February 2012, J.T. was in prison. He was released in December 2012. Between then and the termination trial beginning in January 2015, he had attempted at least five different chemical-dependency programs, of which he successfully completed one. At least three of these programs discharged him unsuccessfully as a result of attendance issues or positive drug tests.

Despite his treatment efforts, the record reveals at least seven documented incidents of J.T.'s drug abuse throughout the county's three-year involvement with the family. In November 2013, he arrived for a scheduled, unsupervised visit with the children under the influence of drugs.

J.T. has overdosed at least three times in his life, the last of which occurred shortly before the termination trial, causing him to become comatose and hospitalized. Because of this overdose-related hospitalization, he was absent from the first day of the termination trial.

### C.L.T.

Throughout Chisago County's three-year involvement with the family, C.L.T experienced repeated trouble with methamphetamine abuse. She has attempted chemical-dependency treatment at least five times since the county's intervention. Although she successfully completed two chemical-dependency treatment programs, she relapsed after both. Since May 2012, C.L.T. reportedly relapsed on methamphetamine at least four times and missed scheduled urinalyses on several separate occasions. Additionally, the county received numerous unsubstantiated reports of drug use at the family home.

The most troubling relapse occurred the night before a critical court date in the child-protection case, at which the county intended to dismiss the case. After finding methamphetamine at J.T.'s house, C.L.T. brought it home with her and used it once the children were asleep; the next morning, she drove to court with three of her children and appeared for the hearing under the influence of methamphetamine.

Related to her drug use, C.L.T. has been incarcerated on several occasions throughout the county's involvement with the family. In May 2012, she was arrested and pleaded guilty to a burglary charge, for which she served approximately one month in jail. She incurred four drug-related probation violations, requiring jail time, before she was ultimately returned to jail in August 2014, to serve her full burglary sentence.

***Chisago County Health and Human Services Involvement***

The county initially intervened with the family in February 2012, and again in April 2012, because of allegations of educational neglect; V. and D. each had accumulated over seven unexcused absences from school. C.L.T. voluntarily accepted services from the county, and the children's school attendance improved.

The county first placed the children in foster care in May 2012, creating a voluntary out-of-home-placement plan for the family. In July 2012, C.L.T. entered full-family foster care with the four children. In late February 2013, with the assistance of the county, C.L.T. and the children moved into independent housing. The family continued to receive voluntary services from the county. In April 2013, upon C.L.T.'s probation violation, the county placed the children in the care of J.T. and family friends

In June 2013, C.L.T and the children returned to independent housing. In August 2013, however, the county filed a child in need of protection or services petition for the four children upon reports that C.L.T. was returning to jail. The county placed the children in a second foster home, and both parents entered admissions to the petition. While the children were still in foster care in October 2013, the county created an out-of-home-placement plan for both parents.

The county returned the children to the parents in February 2014, for a home visit and created a trial-home-visit plan for the parents in March. In May 2014, C.L.T. and the children were evicted from their apartment and entered the New Pathways shelter; the county returned the case to protective supervision. Upon C.L.T.'s August 2014 arrest, related to her appearance in court under the influence of methamphetamine, the county placed the children in a third foster home, where they remained at the time of trial.

### Termination of Parental Rights Trial

The county filed a petition to terminate J.T. and C.L.T.'s parental rights on November 13, 2014, and trial began on January 26, 2015.

At the two-day trial, Andrea Thompson, the Chisago County social worker assigned to the family's case, testified on behalf of the county about her three-year involvement with the family. She emphasized concerns for the lack of stability in the family, homelessness, chemical use, prior reports of domestic violence, the children's unexcused absences from school, and the mental health of the parents and children.

Thompson testified about the services that the county provided for the family throughout its lengthy involvement. She noted that all versions of the out-of-home-

placement and trial-home-visit plans created for the family recommended the parents work toward the following objectives to correct the conditions leading to the out-of-home placement: (i) obtain chemical-use assessments, (ii) attend AA/NA meetings, (iii) maintain sobriety and provide random urinalysis tests, (iv) obtain psychological evaluations, v) manage their mental health, (vi) obtain stable housing, (vii) obtain employment, (viii) obtain medical assistance, (ix) attend the children's appointments, (x) complete a parenting assessment if requested, (xi) complete parenting classes if requested, (xii) comply with any relative search, (xiii) sign any necessary releases, and (xiv) demonstrate the ability to co-parent.

Thompson expressed ongoing doubt about C.L.T's ability to remain sober outside of a treatment environment. She additionally noted that J.T. did not begin working toward the objectives of his out-of-home-placement plan until December 2014. She reported that, although the children missed their parents, particularly C.L.T., they were "generally doing very well" in their third foster home. She testified that, during the county's three-year involvement with the family, the children had attended four different schools and moved eleven times. Because of the length of time the children had been out of the home, the number of moves and placement changes they had endured, and the length of time that the county had been offering services to the parents without significant correction, she recommended termination of parental rights.

C.L.T.'s testimony confirmed many of the details of Thompson's testimony. She admitted to several relapses but testified that she believed her current treatment would result in long-term sobriety. She additionally testified that she intended to divorce J.T.,

6

noting his negative impact on her sobriety. Additionally, V. and D. testified that they did not want their parents' rights to be terminated.

W.F.G., the children's current foster parent, testified about the children's current engagement at school and activities at home. She stated that the three oldest children were attending personal therapy and that the youngest was also recently assessed for personal therapy. Though W.F.G. noted that the children had a bond with both parents, particularly with C.L.T., she testified that they had been asking about their parents less and adjusting well to their foster placement. Further, the youngest child, R., had taken to calling her "mom."

Finally, the recently appointed guardian ad litem testified that, from her review of the family's case, she also supported termination. At the close of trial, the district court requested written closing arguments from all parties.

Following trial, the district court ordered both parents' rights to their children terminated. Through their respective appointed counsels, J.T. and V. and D. timely appealed the termination.

C.L.T., meanwhile, moved for a new trial on ineffective-assistance-of-counsel grounds. This motion did not extend the time to appeal the underlying February 27, 2015 order terminating parental rights, however. After this court stayed the father's and children's appeals pending disposition of C.L.T.'s new-trial motion, the district court accepted jurisdiction, considered C.L.T.'s motion, and then denied it. The district court concluded that, although her trial counsel's performance fell below an objective standard of reasonableness, C.L.T. had not shown that the outcome would have been different if not

for counsel's errors. C.L.T. filed a notice of appeal from the district court's order denying her motion for a new trial.

This court dissolved the stay and consolidated the three appeals, permitting C.L.T. to file a principal brief. Once filed, the county moved to strike portions of C.L.T.'s brief that exceeded the scope of her appeal and all facts outside the record. By order dated December 1, 2015, this court granted the county's motion in part, limiting C.L.T.'s appeal to the denial of her motion for a new trial. The parents and their two oldest children now appeal.

## D E C I S I O N

### I.    Due Process

C.L.T. argues that she was deprived of a full and fair hearing by ineffective assistance of her trial counsel because his preparation for trial was inadequate, he failed to present evidence or witnesses on her behalf, he elicited insufficient testimony from her on direct examination, he failed to object when improper exhibits were introduced, and he was unfamiliar with the case. She contends that these deficiencies, in conjunction with the district court's delay in appointing appellate counsel and ineffective assistance of appellate counsel, deprived her of due process. V. and D. contend that the denial of their mother's due-process rights deprived them of due process as well. Even presuming that the performance of C.L.T.'s counsel's was inadequate, these due-process claims cannot succeed because C.L.T. has not shown that she was prejudiced by counsel's deficient representation.

8

The parent-child relationship is a fundamental right protected by substantive due process. *In re Welfare of Children of B.J.B.*, 747 N.W.2d 605, 608 (Minn. App. 2008). "The applicable due-process standard for juvenile proceedings is fundamental fairness." *Id.* (citing *McKeiver v. Pennsylvania*, 403 U.S. 528, 543, 91 S. Ct. 1976, 1985 (1971)).

Minnesota law entitles parents to effective assistance of counsel at a termination hearing. Minn. Stat. § 260C.163, subd. 3(a) (2014). Appointed counsel in termination proceedings must meet minimum qualifications established by the Judicial Council. *Id.*, subd. 3(g). If a district court cannot find an attorney who meets these qualifications, it may appoint another attorney whom it determines to be otherwise competent. *Id.*; *see also* Minn. Judicial Council, *Minnesota Judicial Branch Policy 604: Qualifications for Attorneys Appointed by the Court to Represent Parents, Guardians, and Legal Custodians in Juvenile Protection Matters* (June 1, 2013).

Minnesota courts have adopted the *Strickland* standard for ineffective assistance of counsel. *See Gates v. State*, 398 N.W.2d 558, 561 (Minn. 1987) (citing *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 2068 (1984)); *In re Welfare of L.B.*, 404 N.W.2d 341, 345 (Minn. App. 1987) (applying the *Strickland* standard in juvenile-court proceedings). Under the *Strickland* standard, a complainant must show that "trial counsel was not reasonably effective and that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *L.B.*, 404 N.W.2d at 345 (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068).

In *State v. Rhodes*, the Minnesota Supreme Court elaborated:

9

> A reasonable probability means a probability sufficient to undermine confidence in the outcome. Thus, we have said that under the prejudice prong, a defendant must show that counsel's errors actually had an adverse effect in that but for the errors the result of the proceeding probably would have been different. The reviewing court considers the totality of the evidence before the judge or jury in making this determination. We need not address both the performance and prejudice prongs if one is determinative.

657 N.W.2d 823, 842 (Minn. 2003) (quotations omitted). Because ineffective-assistance-of-counsel claims involve mixed questions of fact and law, this court reviews them de novo. *Id.*

We are troubled by the quality of representation that C.L.T. received at the termination trial. Despite being appointed sufficiently in advance of trial, and despite being granted a continuance to prepare for trial, C.L.T.'s counsel spoke with her only twice before trial, for no more than fifteen minutes each time. He shared no discovery with her, failed to provide her with copies of the county's exhibits, did not ask her if she had witnesses to call, and failed to inquire into any potential evidence on her behalf.

Additionally troubling is that her trial counsel withdrew from representing C.L.T. before his obligation to her was complete without advising her to seek alternative counsel. Moreover, her substitute counsel, appointed on the final day of the period in which to appeal the termination of parental rights, was unable to file a timely notice of appeal.

Even presuming that C.L.T. has established that her counsel's performance was deficient, however, the totality of evidence before the district court shows that she has not established the required prejudice. *See id.* At the post-trial-motion hearing, C.L.T. testified that she would have called four witnesses at trial if given the opportunity. The witnesses

10

had known C.L.T. for between five months and four years and would have testified that she was a good parent and that "[she] was staying clean." Additionally, C.L.T. proposed introducing documentation of her inpatient treatment at the time of trial and her separation from J.T.[2]

This offer of proof falls short of showing that the outcome of trial would have been different had these four witnesses testified and had treatment records been entered into evidence at trial. Critically, C.L.T. did not present any new facts that would have emerged if more effective counsel had represented her. The district court's termination findings acknowledged and accepted as true the very information that she proposed to present at a new trial. For example, the district court acknowledged her parenting skills, finding that she was a good parent when she was sober; it found, and we agree, "[t]his fact was not in doubt."

Additionally, the district court summarized C.L.T.'s treatment progress at the time of trial and her testimony that she had been separated from J.T. and planned to formally divorce him once she had completed treatment; these facts were also undisputed and accepted by the district court. None of her proposed evidence resolved the district court's chief concern that her extensive history of relapses showed that she could not stay sober in the community for more than six months at a time. C.L.T. makes no assertion of how the outcome of the trial would have been different if her attorney had been better prepared.

---

[2] Before the post-trial-motion hearing, C.L.T. offered additional information, including the details of her treatment and the length of her sobriety following trial. Because this additional information is outside the record, we may not consider it. *See* Minn. R. Civ. App. P. 110.01.

11

In sum, C.L.T.'s proposed evidence does not "undermine confidence in the outcome." *See Rhodes*, 657 N.W.2d at 842. The record shows that the termination trial included meaningful, detailed testimony from all interested parties, adequate cross-examination of witnesses, and thorough consideration of all permissible evidence by the district court. We conclude that C.L.T. was not denied due process by the alleged ineffective assistance of her counsel, and the district court properly denied her motion for a new trial. Because C.L.T. was not denied due process, the due process claims of the children fail as well.

In addition, C.L.T.'s claim of ineffective assistance of appellate counsel is unavailing. Because the district court did not rule on this issue, we would typically decline to consider this claim. *Thiele v. Stich,* 425 N.W.2d 580, 582 (Minn. 1988). But given the gravity of the proceedings here, we will nevertheless consider the merits of her arguments in the interest of justice. *See* Minn. R. Civ. App. P. 103.04 (providing for appellate review of "any other matter as the interest of justice may require"). Because the *Strickland* standard applies to this claim as well, C.L.T. must show "that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *L.B.*, 404 N.W.2d at 345 (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068). As shown below in our discussion of the statutory grounds for termination, which we analyze to address the appeals of the father and the two children, C.L.T. cannot show the requisite prejudice to succeed on her claim of ineffective assistance of appellate counsel.

12

## II.      Sufficiency of the Evidence Supporting Termination

An order terminating parental rights is reviewed "to determine whether the district court's findings address the statutory criteria and whether those findings are supported by substantial evidence and are not clearly erroneous." *In re Welfare of P.R.L.,* 622 N.W.2d 538, 543 (Minn. 2001). This court gives deference to a trial court's decision to terminate parental rights but "closely inquire[s] into the sufficiency of the evidence to determine whether it was clear and convincing." *In re Welfare of J.M.,* 574 N.W.2d 717, 724 (Minn. 1998).

In reviewing a decision to terminate parental rights, this court determines whether clear and convincing evidence supports at least one statutory ground for termination and, if so, whether termination is in the best interests of the child. *In re Welfare of Children of R.W.*, 678 N.W.2d 49, 55 (Minn. 2004). Here, the county alleged, and the district court found, that two statutory grounds for termination existed: failure to correct conditions leading to the out-of-home placement and palpable unfitness to parent.

### A.      *Failure to Correct Conditions Leading to Out-of-Home Placement*

Parental rights may be terminated based on clear and convincing evidence

> that following the child's placement out of the home, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the child's placement.

Minn. Stat. § 260C.301, subd. 1(b)(5) (2014). Upon a showing of the following four factors, the district court will presume that the county's reasonable efforts have failed:

> (i) a child has resided out of the parental home under court order for a cumulative period of 12 months within the preceding 22 months. In the case of a child under age eight at

13

the time the petition was filed alleging the child to be in need of protection or services, the presumption arises when the child has resided out of the parental home under court order for six months unless the parent has maintained regular contact with the child and the parent is complying with the out-of-home placement plan;

(ii) the court has approved the out-of-home placement plan required under section 260C.212 and filed with the court under section 260C.178;

(iii) conditions leading to the out-of-home placement have not been corrected. It is presumed that conditions leading to a child's out-of-home placement have not been corrected upon a showing that the parent or parents have not substantially complied with the court's orders and a reasonable case plan; and

(iv) reasonable efforts have been made by the social services agency to rehabilitate the parent and reunite the family.

*Id.*

The district court concluded that the county had proved by clear and convincing evidence that reasonable efforts failed to correct the conditions leading to the children's placement. Tracking the statutory presumption factors, it noted that the children had resided out of the home for a total of 18 of the 22 months preceding trial, the district court approved the out-of-home-placement plans, the conditions leading to the out-of-home placement had not been corrected, neither parent had shown an ability to maintain sobriety outside of a treatment or incarceration setting, and neither parent had viable housing or employment. The district court further concluded that the county had made reasonable efforts to rehabilitate the parents and reunite the family.

All appellants contend that the district court erroneously concluded that the parents failed to correct the conditions leading to the out-of-home placement. Specifically, C.L.T. challenges the establishment of factor (iii), regarding her compliance with the out-of-home-

14

placement plan, J.T. argues that the district court erred by finding that chemical-dependency-related neglect would continue indefinitely, and all appellants challenge the establishment of factor (iv), regarding the county's reasonable efforts toward reunification.

### 1. C.L.T.'s Compliance with the Out-of-Home-Placement Plan

Noncompliance with a case plan is one way to prove a failure to correct conditions leading to out-of-home placement under Minnesota Statutes section 260C.301, subdivision 1(b)(5)(iii). *In re Welfare of Children of T.R.*, 750 N.W.2d 656, 663 (Minn. 2008). C.L.T. emphasizes the statutory language governing out-of-home-placement plans, asserting that the plans introduced into evidence at trial were neither signed nor adequately explained and did not include a description of the services offered to, or requested by, the family. *See* Minn. Stat. § 260C.212, subd. 1(b)–(c) (2014). By asserting these provisions, C.L.T. appears to implicitly argue that, because not all aspects of the out-of-home-placement and trial-home-visit plans adhered to statutory requirements, C.L.T. cannot be found in noncompliance with the plans. These arguments are unavailing.

Out-of-home-placement plans, including trial-home-visit plans, must be signed, explained to the family, and include a description of services offered and requested. *Id.* Thompson testified that, once established, each of the plans advanced the same objectives, particularly maintaining sobriety, obtaining stable housing, and obtaining stable employment.

To be sure, the record shows that the out-of-home-placement plans created after May 2012 do not identify the provider of the various services C.L.T. was to receive from the county. Nor do they bear C.L.T.'s signature. They do, however, reflect various services

15

and providers relating to the children's needs, including counseling and after-school programs.

These circumstances, however, do not render the plans void nor moot C.L.T.'s obligation under them. C.L.T. does not assert that because the plans lack that information and her signature, they were invalid and, somehow, impossible to comply with. To the contrary, her testimony at trial shows that she understood the terms of her plan and that she received numerous services from the county, of which she availed herself throughout the family's involvement with the county. Moreover, she expressed no misunderstanding about the services provided by the county, and she had ongoing contact with the county social worker. Additionally, Thompson credibly testified that the family had ongoing contact with the county and continued to receive the services described in the exhibits and in testimony.

C.L.T. does not dispute her obligations under the plan nor her actions, and the district court's findings on the matter are not clearly erroneous. Sufficient evidence shows that, despite her best efforts, C.L.T repeatedly breached the terms of her out-of-home-placement and trial-home-visit plans by failing to maintain long-term sobriety, stable housing, and stable employment. Because she did not substantially comply with these critical elements of the out-of-home placement plan, we presume that the conditions leading to the out-of-home placement have not been corrected. *See* Minn. Stat. § 260C.301, subd. 1(b)(5)(iii).

Finally, turning to J.T.'s argument, he asserts that the evidence must show "that the present conditions of neglect will continue for a prolonged, indeterminate period," citing a

termination case based on neglect of a child in foster care. *See In re Welfare of Chosa*, 290 N.W.2d 766, 769 (Minn. 1980); *see also* Minn. Stat. § 260C.301, subd. 1(b)(8) (2014). Because the language on which he relies pertains to a different ground for termination that the county did not allege in this case, it is inapposite here.

## 2. The County's Reasonable Efforts Toward Reunification

In any termination proceeding, the district court must make specific findings that either "reasonable efforts to finalize the permanency plan to reunify the child and the parent were made including individualized and explicit findings regarding the nature and extent of efforts made by the social services agency to rehabilitate and reunite the family . . . ." Minn. Stat. § 260C.301, subd. 8 (2014).

Regarding the county's efforts, the district court found that

> [t]he county has offered the family voluntary services, including two family assessments, provided voluntary case plans, provided out-of-home placement plans, provided voluntary foster placement for the Children, provided for a trial home visit for the family, conducted relative searches, arranged full family foster care, provided for visitations with the Children, counseling for the Children, arranging child care, ARHMS services, assistance with parenting education, transportation, support and housing, mental health referrals for the Parents and the Children, gas cards, referrals to a vehicle loan program, assistance in arranging transportation for the children, providing transportation for the Children personally, assistance in locating homeless shelters, provided safety plans, meetings with the Parents and foster family, assistance in arranging psychological exams and chemical assessments, assisting with arranging chemical treatment and other general child protection case management.

Appellants challenge the adequacy and quality of the services offered by the county. J.T. additionally contends that the county did not make reasonable efforts to reunite the

17

family or to finalize an alternative placement home for the children. We agree with the district court's determination that the county provided reasonable efforts to the family.

Sufficient evidence supports the district court's summary of the services offered to the family. Its findings reflected the testimony of all parties and the services detailed in the out-of-home-placement and trial-home-visit plans, which were entered into evidence. The social worker testified that she could not think of any additional services to offer the parents, and the district court found that the county's services had been "exhaustive."

Thompson's testimony regarding the extent of the parties' out-of-home-placement and trial-home-visit plans belies J.T.'s assertion that the county failed to make reasonable efforts to reunite the family. Addressing his assertion that the county lacked due diligence in its search for an alternative family placement, Thompson testified credibly that the only family member under consideration—the children's paternal grandmother—had failed to complete required procedural steps and was therefore not a viable placement option at the time of trial. We conclude that, because the district court found the social worker's testimony credible, and its findings are not clearly erroneous, it did not err by finding termination appropriate for failure to correct the conditions leading to the out-of-home placement.

Because clear and convincing evidence supports termination of parental rights for failure to correct the conditions leading to out-of-home placement, we need not address whether the parents are also palpably unfit to parent, the other basis upon which the district court terminated their parental rights. *See In re Children of T.A.A.*, 702 N.W.2d 703, 708 (Minn. 2005) (affirming termination of parental rights on one statutory ground).

18

### B.     Best-Interests Analysis

Upon proof by clear and convincing evidence of the statutory basis for termination, the district court must also determine whether termination is in the best interests of the children. *Id.* at 709; *see also* Minn. Stat. § 260C.511, subd. (b) (2014). Provided that the district court finds termination grounds established, the children's best interests "must be the paramount consideration." Minn. Stat. § 260C.301, subd. 7 (2014). If the interests of the parent and children conflict, the children's interests take priority. *Id.*

The best-interests analysis "consists of weighing three primary factors: the child's interest in maintaining the parent-child relationship, the parents' interest in maintaining the parent-child relationship, and any competing interest of the child." *In re Welfare of M.A.H.*, 839 N.W.2d 730, 744 (Minn. App. 2013); Minn. R. Juv. Prot. P. 39.05, subd. 3(b)(3). "Competing interests include such things as a stable environment, health considerations and the child's preferences." *In re Welfare of Children of K.S.F.*, 823 N.W.2d 656, 668 (Minn. App. 2012) (quotation omitted). "Finality is one factor to be considered in determining a child's best interests." *In re Welfare of Children of B.J.B.*, 747 N.W.2d 605, 610 (Minn. App. 2008).

An order terminating parental rights must explain the district court's rationale for concluding that termination is in the child's best interests. *In re Tanghe*, 672 N.W.2d 623, 625 (Minn. App. 2003). "Determination of a child's best interests, however, is generally not susceptible to an appellate court's global review of a record," because of the credibility determinations involved and the multiple factors that must be weighed. *Id.* (quotation marks omitted). This court reviews a district court's ultimate determination that

termination is in a child's best interest for abuse of discretion. *In re Welfare of Children of J.R.B.*, 805 N.W.2d 895, 905 (Minn. App. 2011), *review denied* (Minn. Jan. 17, 2012).

Appellants contend that termination was not in the children's best interests. Specifically, they argue that the district court applied an improper standard to analyze the children's interests, V. may permanently prevent the children's adoption, the children were with their mother for a six-month trial home visit within the time during which they were legally considered out of the home, and the guardian ad litem's testimony cannot reasonably be considered, given her limited involvement. The appellants' arguments are unavailing.

Although the district court did not lay out the three *general* factors before conducting its analysis, its list of factors was longer and more specific than the considerations prescribed by the rules of juvenile procedure. *See* Minn. R. Juv. Prot. P. 39.05, subd. 3(b)(3) (prescribing considerations for the district court before ordering termination). The district court's analysis reflected a more detailed picture of the parties' circumstances than that contemplated by the rules, to the parties' benefit, and did consider the relevant best-interest factors. In addition, the trial-home-visit period does not toll the statutory time the children are considered to be out of the home. *See* Minn. R. Juv. Prot. P. 42.01, subd. 4(c) (noting that a trial home visit counts toward the accumulation of out-of-home placement time).

The district court's analysis expressly considered and weighed the children's preference, their bond with their parents, C.L.T.'s and J.T's engagement as parents, and the children's bleak adoption prospects, yet *still* found that the children were better off

20

placed in foster care indefinitely. Further, the guardian ad litem testified candidly about her limited exposure to the family and qualified her testimony accordingly; the district court's findings reflected this qualification.

Acknowledging J.T.'s bond with the children and the evidence of his positive parenting skills when sober, the district court ultimately concluded that termination of his parental rights was in the children's best interests, citing J.T.'s "vast history of treatment and relapse." Noting J.T.'s overdose-related absence on the first day of trial, his homelessness, his unemployment, and his current placement in treatment, the district court concluded that without termination, the "likelihood of instability [for the children] is far too great."

The district court then concluded that termination of C.L.T.'s parental rights was also in the children's best interests. It recognized that C.L.T. had made progress in her latest treatment program and that she had positive parenting skills while sober. Despite C.L.T.'s earnest testimony about her possibility for sobriety after Project Turnabout, the district court reviewed the many treatment opportunities that were not effective and her demonstrated inability to remain sober outside a treatment or custodial environment. Termination, it finally concluded, was preferable to the county's likely continued involvement with the family and the real possibility of ongoing disruption in the children's lives. Moreover, district court noted that the children's need for permanency outweighed V. and D.'s preference to remain with their parents, concluding that the "[c]hildren's best chance at stability comes via terminating the parental rights of both [p]arents."

21

Stability is a competing interest of the children that can outweigh the parties' interests in preservation of the relationship. *See In re Welfare of R.T.B.*, 492 N.W.2d 1, 4 (Minn. App. 1992) ("During this balancing process, the interests of the parent and child are not necessarily given equal weight. Rather both the interests of the parent and child are considered along with the circumstances of the particular case in an effort to determine which of these interests is to predominate."(quotations and citations omitted)). Given the parents' documented history of incarceration, chemical abuse, dependency treatment, and relapse throughout the county's lengthy involvement with the family, the district court did not abuse its discretion in making the children's stability a priority.

In sum, the district court carefully reviewed and weighed the competing evidence to determine that the needs of the children for stability and care outweighed the interests of their parents, and of the two oldest children, in maintaining the parent-child bond. Accordingly, the district court acted within its broad discretion by finding termination of J.T.'s and C.L.T.'s parental rights to be in the children's best interests.

**Affirmed.**