STATE of Minnesota, Respondent,

v.

Thomas Daniel RHODES, Appellant.

No. C3–98–1839.

Supreme Court of Minnesota.

March 20, 2003.

Mike Hatch, Minnesota Attorney General, Thomas R. Ragatz, Assistant Attorney General, St. Paul, MN, Boyd A. Beccue, Willmar, MN, for Respondent.

Douglas W. Thomson, Deborah K. Ellis, St. Paul, MN, for Appellant.

## OPINION

RUSSELL A. ANDERSON, Justice.

This case returns to us from our remand for postconviction proceedings following appellant Thomas Rhodes' appeal from a judgment of conviction for first-degree murder. Rhodes argues that he is entitled to a reversal of his conviction because his conviction rests on insufficient evidence, or alternatively, that he is entitled to a new trial on the basis of ineffective assistance of trial counsel or newly discovered evidence. We affirm Rhodes' conviction for first-degree murder and the postconviction court's denial of a new trial.

We begin by restating the factual portion of Rhodes' first appeal, *State v. Rhodes*, 627 N.W.2d 74, 77–84 (Minn.2001), and by supplementing those facts as necessary. Because the evidence in this case is wholly circumstantial, we set forth the facts in some detail.

On the night of August 2, 1996, Rhodes and his family were vacationing on the southwest side of Green Lake, near Spicer, Minnesota. About 11:30 p.m., Rhodes and his wife, Jane, left their two sons in their room at the Northern Inn and drove their 1995 Baja Blast, a 14–foot water-jet-type-boat, onto the lake. At some point, as Rhodes was driving, Jane went over the edge of the boat. She was not wearing a life jacket and was not a good swimmer.

Rhodes claimed that he looked for his wife from the boat and in the water and called her name, and then, not finding her, he drove south to shore. He tied the boat to the dock outside of Little Melvin's, a bar located in a building close to the beach, and went to the Northern Inn, behind Little Melvin's and across the street, for help. At the inn, a desk clerk called 911. The desk clerk described Rhodes as "emotionally distressed," incoherent, and "wet from head to toe." He noted Rhodes was wearing a white T-shirt. When Kandiyohi County Deputy Randall Kveene arrived, Rhodes told him that he had been about 1,000 yards north of Little Melvin's dock when Jane went overboard, but Rhodes directed Kveene to search in an area only 400–500 yards northeast of Little Melvin's. When Kveene asked if the location was correct, Rhodes responded that the search should move a little farther north. About 20 to 25 minutes later, when others joined the search, Rhodes indicated to another deputy that the area they were searching, about 100 yards from the area first searched, was the right spot, and the deputy marked the spot.

The search resumed the next morning, August 3, and Rhodes again told one of the law enforcement officers that the search party should move north. The search moved approximately 2,000–3,000 feet north. At about 1 p.m. that day, a fisherman found Jane's body about nine-tenths of a mile northwest of the last-seen point Rhodes had identified.

Rhodes explained what happened on the night of August 2 in two statements, made to law enforcement officers and insurance personnel, which were admitted into evidence at trial. In a police interview conducted on August 15, 1996, Rhodes narrated that he and his wife were "necking" in their boat which was about a thousand yards out from Little Melvin's when a boat without lights on passed between their boat and the shore. Rhodes moved the boat farther north. Then they decided "to go for a spin," and Rhodes accelerated, heading north, to about 40 miles per hour. He looked to the right to navigate by the light of the moon. He saw Jane start to get up and move forward as if she was looking for something. He then looked back to the right. When he next glanced to the left, he saw "her leg or her tennis shoes go over." He did not hear Jane make any noise. He looked for Jane in the water after going back to where he thought she had fallen in, but he could not see well and the waves were getting bigger. He zigzagged east and west from the north toward the south three times looking for Jane. There were no other boats on the lake. He drove to Little Melvin's, tied the boat up to the dock, grabbed a sweatshirt from the boat, noticed that it looked as though Little Melvin's was shutting down, and crossed the street to the Northern Inn.

In an October 10, 1996 interview with an insurance claim representative, Rhodes related that he and Jane had gone out in the boat to be intimate. They drove on the lake in a northeasterly direction from Little Melvin's and sat for a while. When a

boat that did not have lights on approached, Rhodes drove farther north. As they were sitting watching the stars, they heard the boat again and decided to go for a spin. Rhodes took off in a northerly direction and was looking to the right when Jane said something. Rhodes also sensed she was reaching for something. He looked back and saw her in a standing position, taking a step back as if to sit down. Rhodes looked to the right again, and when he glanced back again, he caught a glimpse of her shoes going over the side of the boat and heard what sounded like a muffled scream. Rhodes panicked and missed his first grab at the throttle, then grabbed it and slowed down, turning left and accelerating to return to where he thought Jane had fallen out. After looking for her in the water and calling her name from the boat, Rhodes zigzagged east and west back north and then south as he made his way toward the shore near the Northern Inn.

At trial, the state's theory of the case was that Rhodes accelerated intentionally to cause Jane to fall out of the boat or pushed her out of the boat, zigzagged the area to create wake and possibly hit her, and then misdirected the authorities so that they would not discover her body. The state offered the testimony of Patrol Captain William Chandler of the Hennepin County Sheriff's Office to support the theory that Rhodes intentionally misdirected the authorities. Chandler found it improbable that a body could sink in Green Lake, resurface, and then float nine-tenths of a mile in 13 hours, given the lake temperature and the wind speed. He also thought it unlikely that the body could have remained afloat without a life jacket or, even it if did, that trained observers would overlook a body floating on the water. Therefore, Chandler identified a point near the location where several shore witnesses watched a boat being driven erratically as the likely place Jane went overboard.

The state introduced expert medical testimony to support the state's theory that Jane's death was not accidental. Dr. Lyle Munneke, a Kandiyohi County medical examiner, noted bruising on Jane Rhodes' forehead and nose, on both sides of her face, and from her hairline to the top of her head and observed a cut on the right side of her mouth. Dr. Michael McGee, the forensic pathologist who performed the autopsy, found hemorrhaging beneath the surface bruises. Dr. McGee believed that the hemorrhaging occurred while Jane was alive and used a life-sized clay model of Jane's head to demonstrate that "a single blow" probably did not cause the damage to both sides of Jane's face. Dr. McGee opined that multiple strikes from a boat hull could have caused the injuries.

Dr. McGee also testified about Jane's other injuries. He stated that the laceration on the side of her mouth was premortem and could have occurred when a boat hit her mouth, stretching it to the point of tearing. He explained that the abrasions on the backs of her hands and forehead were likely postmortem and caused by her body sinking and scraping the bottom of the lake while floating face down. Dr. McGee noted paired injuries to Jane's upper forearms that he classified as defensive wounds and soft tissue hemorrhage inside the neck region that did not have corresponding external marks. When asked about the neck trauma, Dr. McGee testified:

Q. Could that have been done by the hull of a boat?

A. I think not.

Q. Could that have been done with a hand, in particular a hand used thus in the V position?

A. I believe that is possible, yes.

The state also sought to prove motive. The state introduced evidence of an alleged extramarital affair to show that the Rhodes' marriage was unstable. A woman who testified at trial admitted to having a six-month nonsexual relationship with Rhodes about one year before Jane's death, but she claimed that Rhodes ended the relationship in mid–1995 because he wanted to work on his marriage. An attorney testified that he met with the Rhodes in May 1995 about a possible divorce, that he calculated the amount of child support each spouse would have to pay the other if only one had custody, that Rhodes would have to pay $650 or $742 in child support out of his $2,400 net monthly income, and that after this meeting, the Rhodes never again met with him about a divorce.

A certified public accountant and director of investigations in the Minnesota Attorney General's Office testified regarding the Rhodes' recently increased debt accumulation and their newly acquired life insurance policies covering Jane. The accountant noted that the Rhodes' debt load nearly doubled between November 1995 and July 1996, largely because the Rhodes bought a new house and upgraded their car and boat. He further testified that the Rhodes had $233,135 in life insurance payable in the event of Jane's accidental death. Of that total, approximately $102,000, which consisted of credit life insurance on the Rhodes' new mortgage, boat, and automobile, were purchased in the four months preceding Jane's death. Additionally, the accountant testified that $50,000 in additional term life insurance on Jane was applied for on July 26, 1996 but was not issued because the insurance company received the application after her death. From the motive evidence, the state theorized that Rhodes planned his wife's death because he could not afford the divorce he desired and because he would obtain substantial insurance benefits if Jane died.

Seeking to augment the physical, medical, and motive evidence, the state offered other circumstantial evidence to highlight inconsistencies in Rhodes' accounts and to undermine his credibility. The state called Pastor Perry Wieland, a member of the local volunteer ambulance service who had been participating in the rescue efforts. Pastor Wieland testified that he had spoken with Rhodes after the unsuccessful search had been called off for the night, and that Rhodes told Wieland that Rhodes had been driving slowly when Jane went over the side of the boat. Deputy Anthony Cruze, a detective for the Kandiyohi County Sheriff's Department, also talked with Rhodes after the search was halted for the night. He testified that Rhodes said he heard Jane say something like, "Oh, shit," and that when he looked back, he saw her tennis shoes go over the back of the boat. The bouncer at Little Melvin's saw Rhodes dock his boat, park it facing into the lake, and walk past Little Melvin's toward the Northern Inn. The bouncer testified that Rhodes did not look distraught. He further testified that light was coming from the bar, that a band was playing, and that there were no other boats on the lake at the time.

Deputy Kveene testified that there were very small waves and a "very large moon" the night of August 2. He related that Rhodes had told Kveene that he thought Jane had been picking up an earring when she went overboard. (A clip-on earring was later found in the boat.) Kveene testified that Rhodes said he immediately

turned around and went back to the area where she had fallen out. Rhodes indicated to Kveene that he saw a boat with no lights at the time he was searching for Jane and that he flashed his lights at the boat but did not call out for help.

Seven different shore witnesses testified that they had watched a person driving his boat in fast, erratic, figure-eight patterns at about the time Jane went overboard. None of the shore witnesses could identify the parties in the boat, but five of the witnesses testified that they heard voices from the boat that sounded as though people were having fun. One witness, however, testified hearing a woman's voice say "Stop. No. It hurts." more than once. Two testified to hearing a woman's scream and then laughter. One of these two witnesses saw a boat with two people in it and then later saw just a man wearing a light-colored shirt. None of the witnesses recalled seeing more than one boat on the lake at the time in question. Two witnesses identified the boat as a light-colored two-tone boat with an inboard motor; this description matches the description of Rhodes' boat. Those two witnesses later saw a male driver circling with the same boat, and one commented to the other that it looked like he was looking for something. After watching for a while, those two witnesses observed the boat head slowly south down the shoreline. The body recovery location was four-tenths of a mile or less from the shore witnesses.

The defense theory of the case was that Jane's death was accidental. Michael Colich represented Rhodes at trial. Claudia Engeland assisted Colich on Rhodes' case and was responsible for medical testimony at trial. In preparation for trial, the defense team hired a private investigator to go to Spicer and Green Lake and look for any relevant information, including favorable and adverse witnesses. Colich and Engeland also visited the Northern Inn and the surrounding area. They spoke with the proprietors of the Northern Inn. The defense team did not locate or interview shore witnesses Brian Hunter or Nicole Bauman (now Smith) in preparation for trial.

■ The defense strategized about how to neutralize the state's evidence. In addition to presenting evidence to advance the defense's theory of the case, the defense planned to discredit and minimize the state's expert medical witnesses. Therefore, their trial strategy was to not linger on Dr. McGee's testimony but rather to object and cross-examine selectively. To that end, Colich and Engeland decided not to contest Dr. McGee's testimony and not to vigorously cross-examine him as long as he did not testify "to a medical certainty." [1] Thus, neither Colich nor Engeland objected to questions posed to McGee on direct examination even though they recognized that certain questions, including the "V" question, were objectionable.[2]

Rhodes did not testify on his own behalf. However, the defense called two expert

---

1. The phrase a "reasonable degree of medical certainty" is often heard in connection with proving future damages for bodily and mental harm in a civil case. Derck Amerman, *Standard of Proof: Probability v. Reasonable Medical Certainty*, Minnesota Trial Lawyer, Spring 1987 at 12; *see also* 4A Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Civil*, CIVJIG 91.25 (4th ed.1999). The phrase has also been used in criminal trials but is not a requirement for conviction. *See, e.g., State v. Morris*, 606 N.W.2d 430, 434 (Minn.2000); *State v. Harris*, 589 N.W.2d 782, 792 (Minn.1999); *State v. Perez*, 516 N.W.2d 175, 176 (Minn.1994); *State v. Chambers*, 507 N.W.2d 237, 238 (Minn.1993).

2. Engeland objected once to the state's use of a life-sized clay model of Jane's head.

witnesses to testify. Dale Morry, a boating accident reconstructionist and former state boating administrator, testified in response to Chandler's testimony for the state that a body floating just beneath the water's surface could easily elude searchers, especially if wind and wake action caused the body to float a long distance.

Dr. Lindsey Thomas, an assistant coroner and assistant medical examiner, testified as the expert medical witness for the defense. Dr. Thomas agreed with Dr. McGee that Jane's head injuries were premortem and that the forehead injury may have been caused by the hull of a boat but testified that the bruising on the sides of Jane's face was caused by internal hemorrhaging as the blood from the forehead injury drained into her face. It was Dr. Thomas's opinion that the hemorrhaging was not caused by multiple blows. Dr. Thomas also testified that bruises on Jane's arms and legs and her neck injury were premortem and consistent with Jane hitting the side of the boat or the water as she fell overboard. Dr. Thomas opined that the forearm bruises were unlikely to be defensive wounds. Finally, Dr. Thomas testified that "a lot of this [trauma to Jane's face] is also from fish and turtle activity."

Following a 12–day trial in July 1998, the jury found Rhodes guilty of first-degree murder. Rhodes, alleging insufficient evidence and newly discovered evidence, brought a motion for a new trial. The basis for the newly discovered evidence was the affidavit of Brian Hunter, a guest at the Northern Inn on August 2, 1996. In his affidavit, Hunter claimed he was walking on the beach near Little Melvin's with his then-girlfriend, Nicole Bauman, when he observed a boat circling before approaching shore at a high rate of speed, saw Rhodes pull the boat onto the beach, and saw Rhodes run from his boat to the inn. Hunter stated that he and Bauman then walked to the Northern Inn, and that when he and Bauman walked through the lobby, he saw Rhodes talking with the desk clerk in a "hysterical" manner that was difficult to understand. Hunter claimed that he learned the following day that a body had been found but that he did not know that Rhodes had been charged with a crime until Hunter returned to the Northern Inn two years later.

The district court denied Rhodes' motion for a new trial. Upon denial of a new trial, Rhodes retained new counsel, filed a notice of appeal, and then moved to stay the appeal for the purpose of completing the record on additional claims through postconviction proceedings. The motion was granted.

In his petition for postconviction relief, Rhodes argued, *inter alia*, that his attorneys' failure to seek a change of venue, failure to vigorously cross-examine Dr. McGee, failure to object to "speculative" testimony, and failure to conduct an adequate pretrial investigation constituted ineffective assistance of counsel. Rhodes presented an affidavit and supporting medical articles from Dr. John Plunkett, a certified forensic pathologist, to show that Dr. McGee's testimony was "wrong and misleading in that his conclusions were speculative, without foundation, and contrary to accepted medical authority." Dr. Plunkett, disagreeing with Dr. McGee's opinion that Jane's neck injuries may have been caused by a hand in the "V" position, stated that "[t]he injuries to Jane Rhodes [sic] neck musculature probably occurred as a result of the hyperextension and overexertion of the neck muscles which occurs during the process of drowning and the

struggle for survival." Dr. Plunkett further concluded:

> The injuries to Jane Rhodes' neck musculature may also be attributed to one or more of the following causes: hypostatic change,[3] post-mortem leakage of venous blood, post-mortem traumatization and breaking of the cadaveric rigidity during recovery or transport of the corpse, extravasation[4] of blood into the tissue spaces as a result of the handling of organs and the incision of vessels during routine post-mortem examinations.

(Footnotes added.)

Several law and medicine journal articles submitted to the postconviction court supported this conclusion. The authors of one article, studying cases involving hemorrhages to the neck musculature that, like Jane's, showed no external neck trauma, concluded that victims' efforts to save themselves may well result in such injuries. They stated: "[I]n the absence of direct trauma to the neck, most cases of anterior neck hemorrhage appear to result from either hypostatic change" or dissection procedures. N. Carter et al., *Problems in the Interpretation of Hemorrhage Into Neck Musculature in Cases of Drowning,* 19(3) Am. J. of Forensic Med. & Pathology 223, 225 (1998). In another article, the authors concluded that the breaking of rigor mortis during the recovery or transport of the corpse caused hemorrhaging in the neck musculature in a suicide by drowning case. Thomas Sigrist & Walter Rable, *Hemorrhages in Skeletal Muscle—Vital or Post Mortem?,* 3 Rechtsmedizin 94, 95 (1993).

Dr. Plunkett also concluded that the injuries to Jane's forearms, characterized by Dr. McGee as "defensive wounds," and to Jane's face, caused by "multiple blows" according to Dr. McGee, were consistent with her body scraping the bottom of the lake.

Finally, Rhodes resubmitted Brian Hunter's earlier affidavit in support of his claim that trial counsel was ineffective because of failure to conduct an adequate pretrial investigation. Specifically, Rhodes argued that counsel should have taken the reasonable steps of obtaining the list of guests registered at the Northern Inn on August 2 or 3, 1996, and contacting them. Rhodes suggested that had this been done, counsel would have discovered that Hunter had relevant information to rebut the state's theory and support Rhodes' theory.

The postconviction court dismissed Rhodes' petition for postconviction relief without holding an evidentiary hearing. In the memorandum accompanying its order for dismissal, the court concluded that Rhodes' complaints about trial counsels' failure to make evidentiary objections and seek a change of venue were matters of trial strategy. The court also noted that Dr. Plunkett's testimony would be "cumulative" to those opinions offered by Drs. McGee and Thomas and was not newly discovered evidence. Because Dr. Plunkett was a co-worker of the defense's medical expert, the court concluded that his opinions were discoverable at the time of trial. While the court did not separately address Rhodes' claim regarding his trial counsels' failure to investigate, it did state

---

**3.** In lay terms, "hypostasis" or "hypostatic change" means the settling or pooling of blood in the dependent parts of an organ or body. *Webster's Third New International Dictionary,* 1116 (1993); *Stedman's Medical Dictionary,* 753–54 (25th ed. illus.1990).

**4.** "Extravasation" is the leaking of blood from blood vessels. *Webster's, supra,* at 807; *Stedman's, supra,* at 553.

that the "advocacy demonstrated in this case on each side was vigorous, thorough, and effective."

Rhodes subsequently brought a motion for reconsideration, alleging that the postconviction court's failure to conduct an evidentiary hearing on his ineffective assistance of counsel claim was erroneous. In support of this motion, Rhodes produced a second affidavit from Hunter and a corroborating affidavit from Nicole Bauman, who accompanied Hunter to the Northern Inn in August 1996. Additionally, Rhodes offered affidavits from two defense attorneys who supported his ineffective assistance of counsel claim. One of the defense attorneys emphasized the importance of the Hunter and Bauman testimony:

> Their testimony * * * presented a stark alternative to the prosecution witnesses. Ms. Bauman and Mr. Hunter indicated they observed five or six boats on the lake during the critical time period, and also observed Mr. Rhodes come straight into the dock and run to the Northern Inn, where shortly thereafter they noticed him explaining that his wife had fallen in the lake. His emotion bordered on the hysterical, consistent with someone who has been in an accident and who has lost a loved one. This testimony would have countered * * * the State's theory that Mr. Rhodes remained rather clinical and abstract not only in his walk to the hotel but in his explanation of what occurred. The number of boats on Green Lake is also critical in that the testimony of the state's witnesses indicated a sole boat on what is a large lake, in the middle of the summer.

> The testimony * * * would have also undercut the prosecution's main witness, and only witness, who said she heard a voice screaming, "Stop. No. It hurts."

The expert defense attorneys' affidavits also supported Rhodes' claim that an objectively reasonable level of representation at trial would have involved the introduction of other, medically-sound explanations for Jane's facial trauma which Dr. McGee believed were the result of "blows." Among other things, one attorney expressly stated that trial counsels' failure to show through examination that Jane may have been injured in one of the many ways suggested by Dr. Plunkett's affidavit and supporting articles constituted ineffective assistance of counsel. Without addressing the supplemental affidavits, the postconviction court summarily denied the motion to reconsider.

Rhodes moved to reinstate his appeal. On appeal, Rhodes challenged five of the district court's evidentiary rulings (the admission of two of the state's visual aids, the admission of testimony regarding Rhodes' alleged extramarital relationship, and his conversations with Wieland and Johnson), contended that the evidence was insufficient to support his conviction, and argued that the postconviction court erred in denying his petition for postconviction relief without conducting an evidentiary hearing on his ineffective assistance of counsel claim. We held that the district court did not abuse its discretion in admitting the evidence at issue and in concluding that the attorney-client privilege did not attach to the Rhodes' joint conversation with attorney Johnson and that the clergy privilege did not attach to Rhodes' conversation with Wieland. However, because material questions of fact remained regarding Rhodes' ineffective assistance of counsel claim, we ordered an evidentiary hearing by the postconviction court to determine whether trial counsels' conduct "fell below an objective standard of reasonableness" and whether "there is a reasonable proba-

bility that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Specifically, we envisioned that the hearing would elicit testimony from Hunter, Bauman, Dr. Plunkett, and others necessary to determine the reasonableness of trial counsels' actions and whether there is a reasonable probability of a different outcome absent trial counsels' alleged errors. We did not address Rhodes' sufficiency of the evidence claim.

■ The postconviction hearing was held on September 10 and 11, 2001, with continued hearings on December 13, 2001, and January 23, 2002. During the September 10 hearing, Rhodes first moved to amend his postconviction petition to allege as an additional ground for relief newly available scientific evidence. The court granted Rhodes' request.[5] The postconviction court then received testimony from expert attorneys Paul Engh, Joseph Friedberg, Ronald Meshbesher, and John Tierney, from medical experts Drs. McGee, Thomas, Plunkett, and Ronald Wright, and from trial counsel Colich and Engeland. Additional lay testimony was received from Hunter, Bauman, Joseph Shemon, Norman Westby, Deputy Kveene, and Rhodes.

Hunter testified, consistent with his affidavits, that while he and Bauman were sitting on the beach next to the lifeguard stand between 11 p.m. and midnight, he observed a boat on the lake. Hunter observed Rhodes drive his boat in circles, head quickly to shore, beach his boat, and run to the Northern Inn for help:

Hearing the boat revved up, just kinda brought your attention looking that direction, the boat doing circles. As far as how big the circles were, I couldn't tell you, but just going in circles. Made maybe five circles and then headed toward shore very swiftly.

\* \* \* \* \* \*

Coming towards shore, slowed down somewhat for the beach, but drove the boat right up on the beach; not to where he was entirely out of the water, but beached the boat, and got out, took off running toward the motel.

\* \* \* \* \* \*

[He][g]ot out of the boat so fast that I remember him almost almost tripping forward because his feet couldn't keep up with how fast he was moving, and ran, I would have to say at top speed, all the way across Little Melvins [sic] yard

**5.** The state argues in its brief that Rhodes has waived the argument that he is entitled to a new trial on the grounds of newly available medical evidence because he did not argue to the postconviction court that newly available medical evidence warrants a new trial. *See State v. Busse,* 644 N.W.2d 79, 89 (Minn.2002) (citing *State v. Sorenson,* 441 N.W.2d 455, 457 (Minn.1989), for the proposition that the court will generally not decide issues raised for the first time on appeal). However, even though Rhodes did not argue this theory in his Postconviction Hearing Memorandum, he did make this argument in his Postconviction Reply Memorandum, and the postconviction

judge addressed it and denied relief in his Memorandum on Defendant's Petition for Post-trial Relief. Additionally, on November 26, 2002, Rhodes filed a motion to supplement the record with this court with pretestimony discussion regarding the motion to amend. He requested that, pursuant to Minn. R. Civ.App. P. 110.05 and Minn. R.Crim. P. 28.02, subds. 8 and 9, that the record be supplemented with seven pages of argument and discussion from the September 10, 2001 postconviction proceedings. On December 23, 2002, this court granted Rhodes' motion to supplement the record by the addition of the supplemental transcript of proceedings held on September 10, 2001.

all the way over across the road into the motel.

\* \* \* \* \* \*

As we walked into the lobby, he was— the person was already in the lobby, shaking, very frantic, soaking wet, trying to—trying to tell a story of some type, of which at the time I didn't know what it was.

Hunter also testified that although he thought it was important for Bauman to sign her affidavit, he did not pressure her to sign it.

Bauman testified before the postconviction court that she saw a boat circling for 20 minutes to half an hour, then walked back to the Northern Inn with Hunter, and that while she and Hunter were in the lobby, Rhodes entered the lobby. She recanted portions of her earlier affidavit that conflicted with her testimony, explaining that not everything in the affidavit Hunter presented for her to sign was true and that she had not looked closely at it before signing it because she had not taken into consideration how serious a matter it is to sign an affidavit. Specifically, Bauman testified that it was true that she and Hunter had been on the beach late on August 2 or early in the morning on August 3, 1996, that she had seen a boat driving in circles, and that Rhodes had entered the lobby wet and hysterical. However, she testified, contrary to statements made in her affidavit, that she did not recall there being a lifeguard station on the beach nor did she stand next to one while watching the boat on the lake. Rather, she remembered standing near Little Melvin's while watching the boat circle. Further, she did not recall seeing any other boats on the lake at the time and did not remember seeing Rhodes' boat

come to shore. Because she and Hunter had walked to the inn before the boat came to shore, she repudiated the statement made in her affidavit that she saw Rhodes jump out of the boat and run across the street to the Northern Inn. Regarding her statement that she had observed Rhodes trying to explain that his wife had fallen out of his boat, she testified that it was incorrect as she did not hear what Rhodes was trying to explain to the desk clerk.

Engeland testified that the defense team did not check the list of guests registered at the Northern Inn on August 2 and 3 or interview them because they were concerned about adverse information coming to light.

Colich explained defense counsels' trial strategy:

The strategy that we implemented was to attack what we felt were weaknesses in the State's case in addition to trying to advance our theory of what had happened in this terrible accident. We also had to deal with, in effect, trying to neutralize what the State intended to argue as motive—other woman, finances, other things like that. So, in order to implement that, we had to make decisions on when we would cross-examine witnesses and why we would cross-examine them. \* \* \* So, the parameters we worked within was [sic] that if at any time Dr. McGee were to testify or attempt to testify to a medical certainty, that we would attack that testimony because we did not feel that there was [sic] any circumstances in this case where the doctor could testify to a medical certainty.

\* \* \* \* \* \*

[I]t was my opinion that unless, as I indicated, he was testifying to a medical

certify [sic], we wanted him [McGee] on and off the stand as soon as possible * * *.

Because "[o]ur strategy dictated that when Dr. McGee testifies, we do not want him coming back into this courtroom to rebut our testimony," Colich testified that he and Engeland agreed "to be careful on how we cross-examine [him], if we chose to cross-examine." Colich testified that he was aware that it is unnecessary for medical experts to testify to a "reasonable [degree of] medical certainty." He thought, however, that if an expert testified to a reasonable degree of medical certainty, that testimony would carry more weight with the jury.

Engh, Friedberg, and Meshbesher, for Rhodes, testified that Rhodes' case turned on medical testimony and that the defense needed to vigorously challenge that testimony because the other circumstantial evidence was marginal. Engh testified that Dr. McGee was the state's key witness and thus the case was over once Dr. McGee testified and went largely unchallenged on cross-examination. The experts agreed that the defense's strategy not to object to Dr. McGee's testimony as long as he did not testify to a medical certainty was not a sound strategic decision because whether or not his opinion was based on a medical certainty would have been meaningless to a jury. Furthermore, they pointed out that this strategy was not followed as Dr. Thomas, Rhodes' expert, was not asked whether her opinions were to a medical certainty and the jury was not instructed on the significance, if any, of that phrase. Additionally, Engh and Friedberg stated that there was no objectively reasonable strategy for not objecting to the "V" question because there was no basis for it in fact, and that by not objecting, the defense conceded the *corpus delicti*. Engh and Meshbesher opined that because it is defense counsel's responsibility to fully investigate a case, it was objectively unreasonable not to conduct a thorough investigation which would have uncovered Hunter and Bauman. Finally, Meshbesher testified that it was defense counsel's responsibility to ensure that the defense expert had all data possible, including microscopic slides, to review prior to trial.

The state called John Tierney. Tierney testified that defense counsel did elicit some information from McGee on cross-examination that was consistent with their theory of the case that Jane's death was accidental. He conceded that while he might not have employed the same strategy, Colich and Engeland's conduct at trial was not inconsistent with their strategy to get McGee on and off the stand quickly.

Rhodes also called three medical experts, Drs. Plunkett, Wright, and Thomas. Plunkett testified that all the injuries to Jane's body, with the possible exception of the injury to her scalp, are typical in drowning victims. He saw no indication of assaultive behavior from the photographs and found no scientific basis from the microscopic slides for concluding when the injuries occurred.

Dr. Wright testified that the most significant hemorrhage, with the exception of the hemorrhage in the scalp, was deep in lymph nodes in the back of the neck. Wright found this significant because this hemorrhage could not have been caused by injury from the outside. Wright testified that the hemorrhage in the neck could have been caused by some kind of pressure to the throat but, equally as likely, could have been caused by a combination of posture and hypostatic reaction, the ex-

travasation of blood, and the hyper-extension of the head, and disagreed with McGee that some of the neck hemorrhage could only be a premortem injury. Wright opined that the most probable cause of extravasation was not direct trauma but a combination of increase in volume inside the blood vessels and the post-drowning posture. He noted that Jane's long fingernails were inconsistent with a struggle.

Dr. Thomas testified that she did not ask to review the microscopic slides collected at the autopsy before trial and that now, having looked at them, she concluded that the slides indicate that Jane's facial injuries occurred either around the time of death or after death, not that they occurred before death. She testified that it was still her opinion that the bruises on Jane's legs and arms were premortem injuries and that the hemorrhage under Jane's scalp was perhaps caused by the hull of a boat. She stated that as a result of reviewing the articles submitted with Dr. Plunkett's affidavit in connection with Rhodes' petition for postconviction relief and others, she believed that the hemorrhage in the neck occurred during the drowning process or post-mortem as a result of hypostasis or a breaking of rigor mortis.

Dr. McGee testified that he did not wish to change any of the opinions he testified to at trial, and he rejected the new theories suggested by the defense. Specifically, he reiterated his opinion that, based on what he observed by the naked eye and on the microscopics, the injuries to Jane's neck, face, and arms were premortem. He explained that the injuries to Jane's neck could not have been caused by hyperextension or overexertion because only one of the hemorrhages was in the muscle; the rest were in the soft tissue. He rejected the hypostatic change theory because the hemorrhaging was localized in the neck. Hypostatic change would affect more than one area on both sides of the body. Similarly, he disagreed with the hypothesis of postmortem leakage of venous blood because the area of hemorrhage in the neck was "in very focal or circumscribed areas" and the vessels were carefully examined during the autopsy. Dr. McGee testified that Jane's injuries were not consistent with postmortem traumatization because the neck hemorrhages were in protected, internal areas. Nor did he believe that extravasation was responsible for the hemorrhaging in the neck because during the autopsy, the neck organs, examined layer by layer, were not removed. Dr. McGee repeated that the injuries on the back of Jane's hands could have been caused by the dead-man's float but that because of the "appearance, location, configuration and swelling of the soft tissue with hemorrhage present," the injuries to Jane's face were not caused by the dead-man's float. Finally, Dr. McGee pointed out that the research subjects for articles referred to by the defense exhibited symptoms different from Jane's.

The postconviction court concluded that Rhodes failed to establish an ineffective assistance of counsel claim and denied relief. The court based its conclusion on several findings of fact, including: (1) that "[t]he investigation of the case done by defense counsel was objectively reasonable"; (2) that Rhodes failed to show he was prejudiced by trial counsel's failure to call Hunter and Bauman as witnesses at trial because Hunter's testimony conflicts with other corroborated testimony and Bauman recanted portions of her affidavit and gave testimony that conflicted with Hunter's; (3) that trial counsels' strategy not to object to McGee's testimony or

cross examine him regarding his testimony unless he stated that they were based on a reasonable degree of medical certainty "did not fall below an objective standard of reasonableness"; (4) that trial counsels' failure to obtain the microscopic slides did not fall below an objective standard of reasonableness; and (5) that "[e]ven if defense counsels' alleged failures were not objectively reasonable, there is not a reasonable probability that the result of the proceeding would be different but for counsels' errors, given the testimony of the shore witnesses at trial, the inconsistent statements of the defendant to investigating officers and insurance personnel and the medical testimony of Drs. Munneke and McGee." The court also denied relief based upon newly discovered scientific evidence.

■ Rhodes appealed,[6] contending that he should be granted a new trial because he was denied effective assistance of counsel or, alternatively, because of newly discovered evidence. Additionally, Rhodes argues that his conviction should be reversed because the evidence presented at trial was insufficient to support it.[7] We vacated our earlier stay of his direct appeal and now consider Rhodes' postconviction appeal and remaining appeal arguments.

## I.

■ Rhodes argues that the evidence produced at trial is insufficient to sustain his conviction. After a careful examination of the record, we conclude that the evidence is sufficient.

■ For a jury to convict a person of first-degree murder, a person must have caused the death of another human being with premeditation and with intent to effect death. Minn.Stat. § 609.185(a)(1) (2002). Premeditation means "to consider, plan or prepare for, or determine to com-

6. Rhodes characterizes this case as "an appeal from the denial of postconviction relief." This characterization is partially correct. At the time Rhodes' case was before us in 2001, we retained jurisdiction and ordered Rhodes' appeal stayed so that the postconviction court could conduct an evidentiary hearing and issue findings and conclusions. *Rhodes*, 627 N.W.2d at 89. Our mandate was that Rhodes move to dismiss or vacate the stay of the appeal within 60 days from the entry of the postconviction court's order. *Id.* We said that if either party wished to appeal the postconviction court's decision, that party should file and serve a supplemental brief within 60 days after the order dismissing or vacating the stay and that the other party should file its brief 45 days thereafter. *Id.* By order dated June 24, 2002, we vacated the stay of Rhodes' direct appeal and implicitly incorporated the remaining appeal issue with Rhodes' postconviction appeal issues.

7. Alternatively, Rhodes argues that counsel's failure to object to the "V" question constitutes plain error and warrants a new trial.

This argument is duplicative. The elements of the plain error test are: (1) error, (2) that is plain, and (3) that affected substantial rights. *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998); *see also* Minn. R.Crim. P. 31.02. The third prong of the plain error test is satisfied if the defendant can prove that the error was prejudicial and affected the outcome of the case. *Id.* at 741; *cf. Gates v. State*, 398 N.W.2d 558, 562 (Minn.1987) (citing *Strickland v. Washington*, 466 U.S. 668, 693–94, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)) ("[T]he defendant must show that counsel's errors 'actually' had an adverse effect in that but for the errors the result of the proceeding probably would have been different."). Because both the plain error and ineffective assistance of counsel tests require a showing of·prejudice, it is redundant to address this claim under plain error. Moreover, because it was counsel's strategy *not* to object to the "V" question, we think it is more appropriate to analyze Rhodes' contention that counsel erred in failing to object to the "V" question as an ineffective assistance of counsel claim.

mit, the act referred to prior to its commission." Minn.Stat. § 609.18 (2002). Premeditation, by definition, requires some amount of time to pass between the formation of the intent and the carrying out of the act. *State v. Moore*, 481 N.W.2d 355, 360 (Minn.1992). Furthermore, while proof of a motive is not an element of premeditated murder, the presence of a motive strengthens a finding that the defendant deliberated over his actions and weakens the argument that the killing was spontaneous. *Id.* at 362. " 'With intent to' * * * means that the actor either has a purpose to do the thing or cause the result specified or believes that the act, if successful, will cause that result." *State v. Darris*, 648 N.W.2d 232, 236 (Minn.2002) (quoting Minn.Stat. § 609.02, subd. 9(4) (2002)). Intent may be inferred from events occurring before and after the crime and may be proved by circumstantial evidence. *Davis v. State*, 595 N.W.2d 520, 525–26 (Minn.1999).

▮▮▮▮ To determine whether the evidence supports a jury's verdict, we review the evidence in the light most favorable to that verdict and assume the jury disbelieved any contrary evidence. *State v. Moore*, 438 N.W.2d 101, 108 (Minn.1989). According to well-settled precedent, a conviction may be based on circumstantial evidence, and circumstantial evidence is entitled to the same weight as other evidence. *State v. Webb*, 440 N.W.2d 426, 430 (Minn.1989); *State v. Race*, 383 N.W.2d 656, 661 (Minn.1986) (quoting *State v. Jacobson*, 326 N.W.2d 663, 666 (Minn.1982)) Where, as here, the jury verdict is based on circumstantial evidence alone, the conviction warrants a higher standard of review, however. *State v. Jones*, 516 N.W.2d 545, 549 (Minn.1994); *State v. Miller*, 488 N.W.2d 235, 240 (Minn.1992). "A convic-

tion based on circumstantial evidence will [only] be upheld if the reasonable inferences drawn from the evidence are inconsistent with any rational hypothesis except that of the defendant's guilt." *State v. Gates*, 615 N.W.2d 331, 337 (Minn.2000); *accord Webb*, 440 N.W.2d at 430. Nonetheless, we recognize that juries are usually in the best position to evaluate circumstantial evidence, and their verdicts are entitled to due deference. *Webb*, 440 N.W.2d at 430; *Race*, 383 N.W.2d at 662. Thus, " 'possibilities of innocence do not require reversal of a jury verdict so long as the evidence taken as a whole makes such theories seem unreasonable.' " *Gates*, 615 N.W.2d at 338 (quoting *State v. Ostrem*, 535 N.W.2d 916, 923 (Minn.1995)).

Rhodes claims that the jury's verdict is unreliable because the conviction rests on wholly circumstantial evidence. The state counters that, viewing the facts in the record and the legitimate inferences that can be drawn from the facts in the light most favorable to the verdict, and assuming that the jury disbelieved contrary evidence, the evidence of Rhodes' guilt is sufficient to support the jury's verdict that Rhodes was guilty of first-degree murder.

We agree with the state. First, given that Jane's body was found less than 13 hours after she went into Green Lake, she could not have fallen into the lake where Rhodes said she did because the depth of the water there was 40 feet and physical evidence proves that, under the circumstances, a body under 40 feet of water would not refloat for three to four weeks. Furthermore, Jane could not have fallen into the lake where Rhodes said she did because, given the wind speed and direction, her body could not have moved nine-tenths of a mile to the location where it was found the next day. The jury could

have reasonably rejected Rhodes' explanation that he was confused and disoriented in giving directions to law enforcement officials at the time of the accident and believed the state's theory that Rhodes lied to the officials about the correct location to search.

Second, the inference that Rhodes killed his wife by causing her to fall into the lake and then running over her is supported by testimony from shore witnesses. Rhodes' defense that he was zigzagging, looking for Jane, or that witnesses must have seen a different boat driving erratically at the time in question could have been reasonably rejected by the jury because numerous witnesses testified they saw only one boat on the lake at that time, that the boat was a jet boat like Rhodes', that the boat was the same color as Rhodes' boat and with lights like the lights on Rhodes' boat, and that it was driving in fast figure eights and nines[8] for about 20 minutes. Furthermore, one witness heard a male and female voice coming from the boat; one heard a woman scream, "Stop. No. It hurts."; and two heard a woman's screams. One witness saw a boat with two people in it and then later saw just a man wearing a light-colored shirt, as did Rhodes.

Third, medical testimony also supports the jury's verdict. Dr. McGee testified that injuries to Jane's face occurred while she was alive and could not have been caused by a single blow but could have been caused by multiple strikes from the hull of a boat. Dr. McGee also testified that the hull of a boat could not have caused the damage to her neck but that a hand in the "V" position could have caused

it. The jury apparently disregarded Dr. Thomas' opinion that Jane's bruises were likely caused by her body's impact with the water or the boat, that facial injuries were caused by pooling blood and fish or turtles, and that the forehead abrasion could have been caused by the hull of the boat.

Additional support for the jury's verdict came from motive evidence, including evidence of a relationship Rhodes had with another woman, evidence that the Rhodes had met with an attorney about a divorce and that Rhodes learned of his child support obligation, evidence that the family household debt nearly doubled between November of 1995 and July 1996, evidence that the amount for which Jane's life was insured increased from $102,000 to $233,000 in the four months preceding her death, and evidence that Rhodes applied for an additional $50,000 in life insurance for Jane a week before she died.

Finally, the jury could have found Rhodes' accounts of what happened out on the lake implausible or inconsistent. It does not seem likely to us that if Rhodes had been looking for his wife in the water and trying to rescue her he would have driven in fast, erratic patterns for 15 to 20 minutes. Furthermore, Rhodes told differing accounts—that he was driving slowly when she fell out and that he was driving almost at top speed, that there were no other boats on the lake at the time Jane fell in and that there was another boat but it did not respond to Rhodes' flashing lights, that Jane fell over the back of the boat and fell over the side, that he heard a muffled scream and that Jane did not scream, and that Rhodes immediately went back to where he thought Jane had

**8.** As one shore witness, who had been a waterskier and a driver in a waterski show, explained, "eights" and "nines" are patterns made up of linear movements and sharp corner turns.

fallen in and that he missed the throttle on the first grab but then turned the boat and headed back.

In looking at the evidence in the light most favorable to the verdict, we conclude that the evidence makes Rhodes' theory that Jane's death was accidental seem unreasonable. We hold, therefore, that the evidence is sufficient in this case to support the jury's verdict that Rhodes is guilty of first-degree murder.

## II.

Rhodes also claims that he has been denied effective assistance of counsel.[9] We disagree.

An ineffective assistance of counsel claim is an alleged violation of the right to reasonably effective assistance of counsel as guaranteed by the Sixth Amendment of the United States Constitution. *Race*, 383 N.W.2d at 663 (citing *Strickland*, 466 U.S. at 684–85, 104 S.Ct. 2052). We analyze ineffective assistance of counsel claims under a two-prong test set forth in *Strickland*. To prevail on such a claim, an appellant must demonstrate that counsel's performance "fell below an objective standard of reasonableness, and that a reasonable probability exists that the outcome would have been different but for counsel's errors." *State v. Lahue*, 585 N.W.2d 785, 789 (Minn.1998) (citing *Scruggs v. State*, 484 N.W.2d 21, 25 (Minn. 1992) (citing *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052). A "reasonable probability" means "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. Thus, we have said that under the preju-

dice prong, a "defendant must show that counsel's errors 'actually' had an adverse effect in that but for the errors the result of the proceeding probably would have been different." *Gates v. State*, 398 N.W.2d 558, 562 (Minn.1987) (citing *Strickland*, 466 U.S. at 693–94, 104 S.Ct. 2052). The reviewing court considers the totality of the evidence before the judge or jury in making this determination. *Id.* We need not address both the performance and prejudice prongs if one is determinative. *Strickland*, 466 U.S. at 697, 104 S.Ct. 2052. According to *Strickland:*

> [a]lthough we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. * * * If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

*Id.*

As ineffective assistance of counsel claims involve mixed questions of law and fact, our standard of review is *de novo. Strickland*, 466 U.S. at 698, 104 S.Ct. 2052; *see also Barger v. United States*, 204 F.3d 1180, 1181 (8th Cir.2000).

Rhodes' ineffective assistance of counsel claim is premised on: (1) counsel's failure to conduct an adequate investigation which would have uncovered Hunter and Bauman and failure to include their testimony at trial; (2) counsel's failure to thoroughly

---

**9.** We refer to Rhodes' trial counsel collectively because, although Rhodes was represented by both Colich and Engeland at trial, he does not distinguish between them for the purposes of his ineffective assistance of counsel claim.

prepare the defense expert; and (3) an objectively unreasonable trial strategy, which includes failing to object to the "V" question and failing to vigorously cross-exam Dr. McGee. Rhodes claims that each of these alleged deficiencies meets the two-part *Strickland* test. The state contends that these alleged errors constitute reasonable trial strategy.

Specifically, Rhodes argues that had defense counsel conducted an adequate investigation, counsel would have discovered Hunter and Bauman and included Hunter's testimony that he witnessed Rhodes running to the Northern Inn and saw more than one boat on the lake late on August 2. He argues that Engeland's justification for the extent of investigation—fear that adverse information would be reported to authorities—was untenable. Additionally, he contends that because defense counsel failed to prepare their expert by not supplying their expert with the microscopic slides, the defense was disadvantaged because McGee, the state's expert, based many of his opinions on the "microscopics we ran." Testimony from three medical experts, he claims, has now disclosed that the "microscopics" do not support McGee's opinions on the timing of Jane's injuries and on the cause of the neck injury. Rhodes posits that defense counsel's trial strategy to not object to the "V" question and to the "microscopics" not in evidence and not vigorously cross-exam Dr. McGee lacks any rational basis, in part because raising an objection to the improper "V" question would not have conflicted with counsel's strategy to get McGee on and off the stand as quickly as possible, and therefore is not strategic. *See Miller v. Anderson*, 255 F.3d 455, 458 (7th Cir.2001), *vacated on other grounds*, 268 F.3d 485 (7th Cir.2001) ("[I]f no reason is or can be given for a tactic, the label 'tactic' will not

prevent it from being used as evidence of ineffective assistance of counsel.").

We conclude that Rhodes' claim for ineffective assistance of counsel fails under the prejudice prong of *Strickland* because Rhodes has not shown that he was prejudiced by counsel's allegedly inadequate representation. Furthermore, Rhodes' claim fails under *Strickland's* performance prong because counsel's representation did not fall below an objective standard of reasonableness.

■ Rhodes has not affirmatively shown that, had Colich and Engeland done what Rhodes claims they should have, it would have made a difference in the outcome of Rhodes' trial. We think it unlikely that had Hunter's and Bauman's testimony been included at trial, the result would have been different. Instead, it is more probable that the jury would not have attached great weight to Hunter's or Bauman's testimony. Hunter and Bauman corroborated Rhodes' location of the boat as they recall seeing a boat circling, not zigzagging, out from the shoreline of Little Melvin's, but five other shore witnesses and the physical evidence suggest that Jane fell overboard in a different part of the lake. Hunter remembered that Rhodes came to shore quickly, beached the boat on the sand, and, once on shore, ran quickly towards the Northern Inn, but Bauman, who was with him on the beach, repudiated parts of her affidavit at the postconviction proceedings, and has now testified that she did not see Rhodes come to shore and that presumably, he was still in his boat on the lake when she and Hunter walked to the Northern Inn and entered the lobby. Furthermore, Bauman disagrees with Hunter that there were several boats on the lake at the time they heard Rhodes' boat "rev up." Bauman's

testimony on this point was corroborated by eight other witnesses. Considering these factors, which significantly undermine the value of Hunter's and Bauman's testimony, Rhodes cannot show he was prejudiced by defense counsel's failure to locate Hunter and Bauman.

■ It is also mere speculation that objecting to the "V" question or vigorously cross-examining Dr. McGee would have helped the defense. By all counts, Dr. McGee was a formidable witness. As Dr. McGee demonstrated at the postconviction hearing, had he been given a second opportunity to answer a question at trial, including a proper hypothetical question, he would have explained his observations and conclusions in greater detail and with greater conviction. Finally, Rhodes has made no showing that a more thorough preparation of the defense expert would have impacted the outcome of his case. Under these circumstances, Rhodes cannot show a "reasonable probability" that the jury's verdict would have been different had counsel not made the alleged errors.

■ Assuming, arguendo, that counsel's alleged errors were prejudicial to Rhodes, Rhodes' ineffective assistance of counsel claim fails nevertheless. To meet the burden of *Strickland's* first prong, a defendant arguing ineffective assistance of counsel must overcome the strong "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). Recognizing that "it is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's

defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable," *Strickland* admonishes reviewing courts to "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 689, 690, 104 S.Ct. 2052. In *Strickland's* words, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689, 104 S.Ct. 2052. In determining whether, under the circumstances, counsel's conduct falls outside of the "wide range of professionally competent assistance," appellate courts "should keep in mind that counsel's function * * * is to make the adversarial testing process work in the particular case." *Id.* at 690, 104 S.Ct. 2052.

In this case, defense counsel visited the crime scene, interviewed witnesses, hired an investigator, interviewed, hired, and prepared expert witnesses, and exercised reasonable skill and diligence in making strategic decisions. Counsel developed a theory of the case and strategized about how best to counter the state's evidence. At trial, counsel attempted to minimize the impact of Dr. McGee, the state's strongest witness. In accord with counsel's strategy to get Dr. McGee on and off the stand quickly, Colich and Engeland decided to limit objections on direct examination. Through cross-examination, counsel elicited testimony from Dr. McGee that supported the defense's theory of accident. Finally, Rhodes' counsel called witnesses to testify for the defense and presented, through Dr. Thomas' testimony, reasonable alternative explanations for Jane's injuries. We fail to find error in counsel's conduct or decisions.

■ Legal representation is an art, not a science. *See id.* at 693, 104 S.Ct. 2052.

Effective assistance of counsel, as mandated by the Constitution, is not violated merely when trial tactics that are providential for one defendant prove to be unfortunate for another. *See id.* ("[A]n act or omission that is unprofessional in one case may be sound or even brilliant in another."). Heeding *Strickland's* admonition that "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged," we cannot say that Rhodes was deprived of his constitutional right to effective representation. *Id.* at 696, 104 S.Ct. 2052. Therefore, because Rhodes failed to demonstrate the kind of prejudice necessary to satisfy the prejudice prong of *Strickland* and because counsel's conduct falls squarely within the wide range of reasonable professional assistance, the postconviction court did not err in concluding that Rhodes' ineffective assistance of counsel claim fails.

### III.

■ Additionally, Rhodes argues that newly discovered evidence, in the form of Hunter's and Bauman's postconviction testimony and recent medical articles, entitles him to a new trial. We do not agree.

■ To be successful, a petitioner for postconviction relief claiming newly discovered evidence must establish:

(1) that the evidence was not known to him or his counsel at the time of trial, (2) that his failure to learn of it before trial was not due to lack of diligence, (3) that the evidence is material (or, as we have sometimes said, is not impeaching, cumulative or doubtful), and (4) that the evidence will probably produce either an acquittal at a retrial or a result more favorable to the petitioner.

*Race v. State,* 417 N.W.2d 264, 266 (Minn. 1987); *see also Sutherlin v. State,* 574 N.W.2d 428, 434 (Minn.1998); Minn. R.Crim. P. 26.04, subd. 1(1)(5). Where the decision whether to grant a new trial turns on a claim of newly discovered evidence, we will not disturb the court's denial of a new trial absent an abuse of discretion. *Berry v. State,* 364 N.W.2d 795, 796 (Minn. 1985).

Rhodes contends that the postconviction testimony from Hunter and Bauman entitles him to a new trial because this evidence was not known to him or to counsel at the time of trial, Rhodes' failure to learn of their testimony was not due to a lack of diligence on his part, this evidence is material because it corroborates the location of the boat on the lake according to Rhodes, and the Hunter and Bauman testimony would likely produce an acquittal. The postconviction court, finding Hunter's testimony dubious and concluding that testimony from Hunter and Bauman would not produce a result more favorable to Rhodes at a retrial, denied Rhodes a new trial on the basis of newly discovered evidence.

Considering the content of the testimony and the deference we give to the postconviction court that was able to observe the demeanor of the witnesses, we conclude that Rhodes' claim fails. As we said above, neither Hunter's nor Bauman's testimony is likely to produce a more favorable outcome in the event we were to grant Rhodes a new trial because the physical, medical, and motive evidence presented at trial remains unaffected by Hunter's and Bauman's testimony. Furthermore, Hunter's testimony was dubious, and Bauman's testimony was substantially cumulative. *See Dale v. State,* 535 N.W.2d 619, 622 (Minn.1995) (concluding that Dale's newly discovered evidence was not

material because some of it was impeaching, cumulative, and doubtful, and some of the evidence lacks probative value). Therefore, we conclude that the district court did not abuse its discretion in denying Rhodes a new trial based on Hunter's and Bauman's testimony.

Alternatively, Rhodes argues that recent medical articles about hemorrhage in the neck and other postmortem changes in drowning cases entitle him to a new trial based on newly available evidence.[10] He claims he meets all four criteria: (1) the evidence was not known to him, his counsel, or expert at the time of trial; (2) the medical articles were not published until after Rhodes' trial and thus were not missed because of lack of diligence; (3) the evidence is clearly material as to the evaluation of hemorrhage in the neck tissue; and (4) the newly available medical evidence would probably produce an acquittal at a new trial as the verdict hinged on circumstantial medical evidence. *See State v. Warren,* 592 N.W.2d 440, 450 (Minn. 1999) (applying the newly discovered evidence test to newly available evidence). In support of the last criterion, Rhodes submitted an affidavit from his expert that her testimony would have been different had she been able to review these articles before Rhodes' trial.

We conclude that, even if the articles present ground-breaking research and thereby meet the third prong of the test, Rhodes' argument fails nevertheless. Neither the journal articles nor the medical testimony stemming from them would likely result in an acquittal. This allegedly newly available medical evidence does not diminish the circumstantial evidence heard and considered by the jury. There was sufficient evidence independent of the medical evidence, including physical and motive evidence, testimony as to Rhodes' conduct, and inconsistencies in Rhodes' statements, to conclude that Jane's death was a premeditated homicide. Simply put, Rhodes has not established, as he must under prong four, that the allegedly newly discovered evidence would probably produce an acquittal or a result more favorable to him on retrial. Therefore, we hold that the postconviction court did not abuse its discretion in concluding that Rhodes is not entitled to a new trial on the grounds of newly discovered medical evidence.

Affirmed.

GILBERT, J., took no part in the consideration or decision of this case.

---

10. Rhodes cites two articles published in medical journals after his trial: N. Carter et al., *Problems in the Interpretation of Hemorrhage Into Neck Musculature in Cases of Drowning,* 19(3) Am. J. Forensic Med. & Pathology, 223, 223–25 (1998), and K. Puschel et al., *Macromorphology and Histology of Intramuscular Hemorrhages in Cases of Drowning,* 112 Int. J. Legal Med., 101, 101–06 (1999).